WR-41,706-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/29/2015 2:55:44 PM
Accepted 1/29/2015 4:30:08 PM
ABEL ACOSTA
CLERK

NO. _____

RECEIVED
COURT OF CRIMINAL APPEALS
1/29/2015
ABEL ACOSTA, CLERK

## IN THE COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

_____

**LEON DAVIS,**
*Relator,*

**vs.**

**THE HONORABLE NINTH COURT OF APPEALS,**
**AT BEAUMONT, TEXAS,**
*Respondent*

*Arising from No. 09-14-00337-CR*
*Court of Appeal, Ninth District of Texas at Beaumont*

_____

**LEON DAVIS' MOTION FOR LEAVE TO FILE**
**PETITION FOR WRIT OF MANDAMUS**

_____

**COMES NOW, LEON DAVIS**, Relator, by and through his Counsel of Record, RICK BRASS, pursuant to TEX.R.APP.P. 72.1, and seeks leave of this Honorable Court to file the attached Petition for Writ of Mandamus complaining of the actions of the Court of Appeals For the Ninth District of Texas, Beaumont.

**WHEREFORE, PREMISES CONSIDERED**, Relator prays that this motion be granted and that this Court grant him leave to file the attached Petition for Writ of Mandamus.

**RESPECTFULLY SUBMITTED,**

**BRASS & McCOTTER
207 SIMONTON
CONROE, TEXAS 77301
rbrass1@yahoo.com
Tel (936) 788-5700
Fax (936) 788-5701**

By: *Rick Brass*
_____
    **RICK BRASS
    Texas Bar No. 02909450**

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing instrument were mailed to the Respondent and counsel for the real parties in interest on the date of the mailing of the original to the Clerk of this Court.

*Rick Brass*
_____
**RICK BRASS**

NO. _____

# IN THE COURT OF CRIMINAL APPEALS
# AT AUSTIN, TEXAS

---

## LEON DAVIS,
*Relator,*

## vs.

## THE HONORABLE NINTH COURT OF APPEALS,
## AT BEAUMONT, TEXAS,
*Respondent*

---

*Arising from No. 09-14-00337-CR*
*Court of Appeal, Ninth District of Texas at Beaumont*

---

## RELATOR'S PETITION FOR WRIT OF MANDAMUS

---

**Rick Brass**
**Rbrass1@yahoo.com**
**SBN: 02909450**
**207 Simonton**
**Conroe, Texas 77301**
**Phone: 936-788-5700**
**Facsimile: 936-788-5701**

*Counsel for Relator*
*Leon Davis*

## ORAL ARGUMENT REQUESTED

<u>**IDENTITY OF PARTIES AND COUNSEL**</u>

**Pursuant to Tex.R. App.Proc. 52.3(a), the realtor offers the following list of parties to this case and counsel for the parties:**

| | |
|---|---|
| **Respondent:** | **THE HONORABLE NINTH COURT OF APPEALS, AT BEAUMONT, TEXAS** |
| | Carol Anne Harley, Clerk of the Court |
| | Ninth Court of Appeals |
| | 1001 Pearl St., Suite 330 |
| | Beaumont, TX 77701-3552 |
| | |
| **Relator:** | **Leon Davis** |
| | |
| **Counsel for Davis:** | **Rick Brass** |
| | BRASS & McCOTTER |
| | Rbrass1@yahoo.com |
| | SBN:  02909450 |
| | 207 Simonton |
| | Conroe, Texas  77301 |
| | Phone: 936-788-5700 |
| | Facsimile: 936-788-5701 |
| | |
| **Real Party In Interest:** | **Brett W. Ligon** |
| | Montgomery County District Attorney |
| | |
| **Counsel for Real Party In Interest:** | **William J. Delmore III** |
| | Assistant District Attorney |
| | 207 W. Phillips, Second Floor |
| | Conroe, Texas 77301 |
| | (936) 539-7800 |
| | |
| **Real Party In Interest:** | **Barbara Adamick** |
| | Montgomery County District Clerk |
| | |
| **Counsel for Real Party In Interest:** | **M. Michael Meyer** |
| | Assistant District Attorney |
| | 207 W. Phillips, Second Floor |
| | Conroe, Texas 77301 |
| | (936) 539-7828 |
| | |
| **Real Party In Interest:** | **Honorable Kelly W. Case** |
| | 9th Judicial District Court |
| | 301 North Main Street |
| | Conroe, Texas 77301 |
| | Phone:  (939)-539-7866 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ...........................................................i

JURISIDICTION ...................................................................................................1

STATEMENT OF FACTS ....................................................................................2

STATEMENT REGARDING ORAL ARGUMENT ...............................................5

GROUNDS IN SUPPORT OF MANDAMUS RELIEF...........................................5

ARGUMENT AND AUTHORITIES....................................................................6

I.      THE STANDARD OF REVIEW FOR OBTAINING MANDAMUS
        RELIEF...................................................................................................6

II.     MANDAMUS RELIEF IS APPROPRIATE IN THIS CASE..................7

A.      RELATOR HAS NO ADEQUATE REMEDY AT LAW..............................8

B.      RELATOR HAS A CLEAR RIGHT TO RELIEF .......................................9

1.      The Trial Court's order to produce the addresses of all jurors summonsed
        during 2013 was not a "ministerial" act because the Montgomery County
        Electronic Jury Selection Plan gives the Trial Court the authority to view the
        address data ordered to be produced...........................................................10

2.      The Trial Court did not abuse its discretion. ...............................................12

A.      The order to produce limited juror address data did not violate Article 35.29
        of the Code of Criminal Procedure nor Section 62.0132 of the Government
        Code.  The Trial Court's Order was discretionary, not a ministerial act;
        therefore, the Trial Court did not abuse its discretion and mandamus relief
        should not have issued. ...............................................................................13

a.      Article 35.29 of the Code of Criminal Procedure was not violated in this
        case because the juror address data is not collected from any juror

questionnaire or information supplied during the voir dire process..............17

**b.** Section 62.0132 of the Texas Government Code is not violated in this case because the address data is not collected from a jury questionnaire.............16

**c.** The address data of those summoned is not protected information. ............17

i. The addresses of those jurors summoned are available from public sources.....17

ii. The private vendor given the juror information is not under a confidentiality agreement; however, the experts in this case will be subject to a confidentiality agreement.................................................................................................18

iii. The Jury Selection Plan states that the Judge has discretion to review the list of all summoned prospective jurors and the Judge has appointed experts to review only the jury address data. ...............................................................................19

B. The Trial Court has authority over the District Clerk of Montgomery County; therefore the Trial Court's Order to turn over address data was not an abuse of discretion and mandamus relief should not have issued. ..................................19

**1.** §62.011(b)(4) of the Texas Government Code and Montgomery County Electronic Jury Selection Plan Sections (B), (E), and (F) all provide that the District Clerk is the agent of the District Court............................................20

**2.** The District Clerk consented to the District Court's personal jurisdiction...22

**3.** The electronic data ordered to be produced already exists. ..........................23

C. Article 39.14 of the Texas Code of Criminal Procedure is inapplicable as the requested juror address data is not in possession of the District Attorney nor any of his agents; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued. ........................................................24

D. The Compulsory Process Clause authorizes the Trial Court's action; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued.................................................................................................24

E. The juror address information is needed to ensure that Defendants in Montgomery County are tried by a constitutionally valid jury; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued..................................................................................................................25

**1.** The Fourteenth Amendment requires that equal protection must actually be given to all and not be merely an empty promise..............................................26

**2.** The Sixth Amendment right to a jury trial requires selection of a petit jury from a representative cross section of the community. ...............................................28

F. The Constitutional complaint is ripe and valid; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued......................32

1. Because Davis is not seeking information from juror questionnaires, his challenge is not premature. ...............................................................................34

2. Evidence produced at the May 21, 2014, hearing demonstrates there is an apparent exclusion of African-Americans in the jury summonsing process......34

PRAYER FOR RELIEF ...............................................................................................35

CERTIFICATE OF SERVICE .........................................................................................36

VERIFICATION.............................................................................................................37

APPENDICES ..............................................................................................................38

# INDEX OF AUTHORITIES

**Cases:**

*Bill Hill v. Court of Appeals*,
      67 S.W.3d 177, 180 (Tex. Crim. App. 2001 ...................................................9

*Byke v. City of Corpus Christi*,
      569 S.W.2d 927, 932 (Tex.Civ.App. -- Corpus Christi 1978) ......................16

*City of Rockwall v. Hughes*,
      246 S.W.3d 621, 625-26 (Tex. 2008) ...........................................................15

*Dickens v. Court of Appeals*,
      727 S.W.2d 542, 550 (Tex. Crim. App. 1987) ...........................................7, 8

*Fitzgerald v. Advanced Spine Fixation Sys., Inc.*,
      996 S.W.2d 864, 865-66 (Tex. 1999) ...........................................................15

*Hernandez v. Texas*,
      347 U.S. 475, 477 (U.S. 1954) ...............................................................25, 32

*Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*,
      456 U.S. 694, 703 (U.S. 1982) ....................................................................23

*Miles v. State*,
      *157 Tex.Crim. 188, 247 S.W.2d 898, 899 (1952)*...........................................16

*Missouri v. Duren*,
      439 U.S. 357, 364 (U.S. 1979) ....................................................................29

*Nat'l Liab. & Fire Ins. Co. v. Allen*,
      15 S.W.3d 525, 527 (Tex. 2000) ..................................................................15

*Padieu v. Court of Appeals of Texas, Fifth District*,
      392 S.W.3d 115, 117 (Tex. Crim. App. 2013) .....................................1, 7, 8, 9

*Ramseur v. Beyer*,
      983 F. 2d 1215, 1230 (3d Cir. 1992)............................................................29

*Ruiz-Angeles v. State*,
     351 S.W.3d 489, 496 (Tex.App.— [14th Dist.] 2011) (pet. refused) ............14

*Simmons v. Arnim, ,*
     110 Tex. 309, 324,  220 S.W. 66  (Tex. 1920)................................................15

*Smith v. Texas*,
     311 U.S. 128, 130 (U.S. 1940) ....................................................................26

*Taylor v. Louisiana*,
     419 U.S. 522, 528 (U.S. 1975) ....................................................................28

*Texas Dept. of Corrections, Etc. v. Dalehite*,
     623 S.W.2d 420, 424 (Tex. Crim. App. 1981) ...............................................9

*United States v. Weaver,*
     267 F.3d 231, 240 (3d Cir. 2001) ............................................................2, 30

*United States of America v. James Stile*,
     2014 U.S. Dist. LEXIS 65390 (D. Me., 2014) .............................................20

*United States of Amerieca v. Kaboni Savage,*
*Robert Merritt, Steven Northington, Kidada Savage*,
     2012 U.S. Dist. LEXIS 142844 (E.D. Pa., 2012)...............................19, 30, 31

*United States v. Murphy*,
     464 F. App'x 60, 63 (3d Cir. 2012) .............................................................30

*United States v. Royal,*
     100 F.3d 1019, 1025 (1st Cir. 1996) ............................................................34

*United States v. Test,*
     420 U.S. 28, 29-30 (1975) ..........................................................................31

*Wade v. Mays*,
     689 S.W.2d 893, 898 (Tex. Crim. App. 1985) ..................................9, 10, 12

*Washington v. McSpadden*,
     676 S.W.2d 420, 422 (Tex. Crim. App. 1984) ...............................................9

**Statutes:**

Texas Code of Criminal Procedure, Article 4.04 .....................................................1

Texas Code of Criminal Procedure, Article 35.29 ................ ii, 5, 12, 13, 14, 16, 17

Texas Constitution, Section V, Section 5 .................................................................1

Texas Government Code, Section 62.011 ................................... iii, 4, 10, 20, 21, 22

Texas Government Code, Section 62.0132 ...........................ii, iii, 5, 12, 13, 14, 17

Texas Government Code Ann, Section 311.011(a) .................................................15

Texas Rules of Appellate Procedure, Section 72.1.....................................................1

United States Constitution, Sixth Amendment...................... 6, 20, 25, 26, 28, 29, 30

United States Constitution, Fourteenth Amendment ...............................6, 26, 27, 28

*TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:*

**LEON DAVIS, Relator**, by and through his Counsel of Record, RICK BRASS of BRASS & McCOTTER, pursuant to TEX. R. APP. P. 72.1, files this Petition for Writ of Mandamus, complaining of Respondent, the Honorable Ninth Court of Appeals, in Beaumont, Texas, and of said Court's Memorandum Opinion in No. 09-14-00337-CR and in support thereof will show this Honorable Court the following:

**JURISIDICTION**

This Court has mandamus jurisdiction over the Court of Appeals, Ninth District of Texas at Beaumont, pursuant to Article 4.04 of the Texas Code of Criminal Procedure along with Article V, Section 5 of the Texas Constitution.[1] "The court of criminal appeals does not have jurisdiction to review an appellate court's decision in its exercise of original jurisdiction by way of petition for discretionary review, so mandamus is the realtor's only remedy at law." *Padieu v. Court of Appeals of Texas, Fifth District*, 392 S.W.3d 115, 117 (Tex. Crim. App. 2013).

---

[1] Art. 4.04, Sec. 1 "The Court of Criminal Appeals and each judge thereof shall have, and is hereby given, the power and authority to grant and issue and cause the issuance of writ of habeas corpus, and, in criminal law matters, the writ of mandamus, procedendo, prohibition and certiotari. The court and each judge thereof shall have, and is hereby given, the power and authority to grant and issue and cause the issuance of such other writs as may be necessary to protect its jurisdiction or enforce its judgments." TX. Code of Crim. Proc. Ann. Art. 4.04

**STATEMENT OF FACTS**

Relator, Leon Davis maintains the summoning process of jurors in Montgomery County, Texas is broken because the process does not provide a random and fair cross-section of the community. The number of African-American venire-persons does not appear to be fair and reasonable in relation to the number of such persons in the community.

Davis filed a motion challenging the jury selection process in Montgomery County, Texas. On May 21, 2014 and upon Motion of Relator's Counsel of Record, the Ninth Judicial District Court, conducted an evidentiary hearing in which several criminal defense attorneys provided evidence about the number of African-American venire-persons they personally observed during jury selection proceedings in previous trials.[2] African-Americans are a distinctive group. *See United States v. Weaver,* 267 F.3d 231, 240 (3d Cir. 2001).

At the May 21, 2014, evidentiary hearing, there was testimony from several local lawyers regarding the sparsity of African-American jurors on jury panels.[3] There was also testimony from Dr. Karl Eschbach, an expert demographer hired by Davis, who reviewed the number of African-Americans summoned for jury duty.

---

[2] The attorney witnesses were, Lydia Clay-Jackson, E. Tay Bond, Jerald Crow, Patricia Magninnis, Brian Burns, Ray Stokes and Gilbert Garcia. See Reporter's Record, Appendix A,

[3] A transcription of the court-reporter's notes from the May 21, 2014, the evidentiary hearing is attached as Appendix A. This is referred to as the Reporter's Record.

Based upon the evidence which Dr. Eschbach heard, he expressed the opinion that further investigation was necessary to determine if the jury pool is racially balanced.[4]

In order to complete his study, Dr. Eschbach testified that he would need the address of every person summoned during the year 2013. The Trial Court ordered the Montgomery County District Clerk (herein "District Clerk") to provide address data in electronic form of all individuals summoned for jury duty during 2013, which delivery would be conditioned upon the experts signing a confidentiality agreement.[5]

In addition, Dr. Eschbach explained that he and Max Beauregard, another expert, sought the juror address information in order to overlay a map of the summoned jurors' addresses over another map reflecting the actual distribution of African-American citizens throughout the county's neighborhoods based upon the 2010 census.

All parties agree that the District Clerk receives the master list of eligible jurors from the Secretary of State. This master list is made up of all individuals in Montgomery County who either (1) are registered voters; (2) have a Texas driver's license; or (3) have a Texas state identification card. According to the Montgomery County Electronic Jury Selection Plan, (herein the "Plan") which is administered

---

[4] See Reporter's Record, Appendix A, Page 73, Line, 23 through Page 74, Line 3.
[5] Appendix B Order Signed 8/4/2014 by Judge Case.

by the District Clerk, jurors are supposed to be summonsed on a random basis. The summonses are produced by a computer program approved under Section 62.011 of the Government Code. ("Electronic or Mechanical Method of Selection)."[6]

At the same May 2014 evidentiary hearing, the District Clerk's attorney of record took the lead in cross-examining Davis' witnesses and expert.[7] At that hearing, the District Clerk offered no rebuttal testimony and called no witnesses to rebut the testimony presented by Davis.[8] The only evidence before the respondent judge was the evidence elicited by Davis through his attorney of record. Neither the District Clerk nor the Montgomery County District Attorney (herein "District Attorney") presented any evidence to rebut Davis' contention.

On October 8, 2014, the Court of Appeals for the Ninth District of Texas at Beaumont conditionally granted the mandamus petition of Brett W. Ligon, the Montgomery County District Attorney, and Barbara Adamick, the Montgomery County District Clerk, ordering the Trial Court of the Ninth Judicial District Court of Montgomery County, Texas, to vacate his order requiring disclosure to the

---

[6] *See* Tex. Gov't Code Ann. § 62.011 (West 2013). The trial court --although engaged in a hearing about jury selection procedures—did not admit into evidence the Montgomery County's electronic jury selection plan adopted by the board of judges and commissioner's court pursuant to section 62.011; but the trial court did permit it to be included in the record for this Court's review, and a copy is attached as Appendix C. See Reporter's Record, Appendix A, Line 25, Page 122 through Line 4, Page 124.

[7] See Reporter's Record, Appendix A, Page 3 showing that the State and the District Clerk called no witnesses.

[8] See Reporter's Record, Appendix A, Page 8, Lines 2 through 4.

defense's retained experts <u>only the address</u> of every person summoned for jury service in Montgomery County for 2013.

**STATEMENT REGARDING ORAL ARUGMENT**

Counsel for the Appellee requests oral argument and believes that it would be beneficial to the Court to be available to respond to questions regarding this case and the applicable law involved.

**GROUNDS IN SUPPORT OF MANDAMUS RELIEF**

The Beaumont Court of Appeals misapplied the law by making confidential, information which is provided to Montgomery County under its Jury Selection Plan by the Secretary of State and by the Department of Public Safety, when that information is not designated as "confidential" by Texas law.[9] This information is used to compile the "jury wheel" in order to summons those who might serve on a jury.

1. Article 35.29 of Texas Code of Criminal Procedure and Section 62.0132 of the Texas Government Code do not apply to the Trial Court's Order because information obtained from <u>juror summons</u> is separate and distinct from information gathered from <u>juror questionnaires</u>; the summons data (here, Trial Court's Order for addresses of all those summonsed in 2013) is not confidential, while the questionnaire data (gathered from the venire panel

---

[9] Tex Gov't Code Section 62.0312(f) which makes only information given by a prospective juror in response to a juror questionnaire.

during the voir dire process) is confidential. Therefore, mandamus against the Trial Court should not have issued and this Court should issue mandamus against the Ninth Court of Appeals.

2. The Montgomery County Electronic Jury Selection Plan gives the Trial Court the authority over the Montgomery County District Clerk, who is in possession of the address data, and that data is not part of criminal discovery, so the Montgomery County District Attorney is not a proper party. Therefore, mandamus against the Trial Court should not have issued and this Court should issue mandamus against the Ninth Court of Appeals.

3. The Compulsory Process Clause grants the Trial Court authority to issue the Order to secure petit juror address data. Therefore, mandamus against the Trial Court should not have issued and this Court should issue mandamus against the Ninth Court of Appeals.

4. The Fourteenth and Sixth Amendments to the United States Constitution provide Davis with the right to be tried by a jury that fairly represents Montgomery County, Texas and the testimony from May 21,2014 warrants a statistical investigation of the Montgomery County jury summonsing process.

5. Davis has a valid and ripe Constitutional complaint regarding the jury summoning process of Montgomery County, Texas. Davis' complaint is supported by evidence and testimony which suggests a systematic exclusion of African-Americans in the jury summoning process. The complaint is not premature and mandamus relief against the court of appeals should issue.[10]

**ARGUMENT AND AUTHORITIES**

**I.    THE STANDARD OF REVIEW FOR OBTAINING MANDAMUS RELIEF**

"The traditional two-prong test for mandamus relief requires that a relator show he has no adequate remedy at law and that the action he seeks to compel is

---

[10] Appendix A, Reporter's Record

ministerial, rather than one involving judicial discretion. *Padieu v. Court of Appeals of Tex.*, 392 S.W.3d 115, 117 (Tex. Crim. App. 2013). "However, when this Court reviews an appellate court's mandamus decision, the inquiry is whether there was a clear abuse of discretion, and this Court's review is conducted "essentially conducted by taking a 'de novo application of the two pronged test mentioned above.'" *Id.* Therefore, Davis must show the Ninth Court of Appeals abused its discretion because (1) the Trial Court did not violate a ministerial duty and (2) Davis has no adequate remedy at law. Di*ckens v. Court of Appeals*, 727 S.W.2d 542, 550 (Tex. Crim. App. 1987); *see also Padieu,* 392 S.W.3d at 117.

In this case, Davis seeks mandamus relief against the Ninth Court of Appeals after that court conditionally granted mandamus relief against the Trial Court of the Ninth Judicial District Court of Montgomery County, Texas and asks this Honorable Court to mandamus the Ninth Court of Appeals and order the Beaumont Court to withdraw its mandamus order.

## II.    MANDAMUS RELIEF IS APPROPRIATE IN THIS CASE

At the Ninth Court of Appeals, Relators were the Montgomery County District Attorney and the District Clerk and they sought a mandamus to vacate the Trial Court's order requiring the District Clerk to turn over the electronic address data of

those summoned as prospective jurors during 2013.[11]  Because this is a case in which a mandamus has already been conditionally granted, Davis cannot petition for discretionary review and has no remedy at law other than to seek a mandamus action against the court of appeals. *Padieu*, 392 S.W.3d at 117; *see also Dickens,* 727 S.W.2d at 549.

Davis has a clear right to relief in having the mandamus against the Trial Court overturned because the Ninth Court of Appeals clearly abused its discretion. Davis contends that the Ninth Court of Appeals abused its discretion because: (1) the Trial Court's order was not a "ministerial" act since the Plan gives the trial court the authority to view the summonsed jurors, and (2) the Trial Court's order did not violate any provision of the Code of Criminal Procedure or the Texas Government Code.

### A. RELATOR HAS NO ADEQUATE REMEDY AT LAW

In this case, the Ninth Court of Appeals conditionally granted a mandamus against the Ninth Judicial District Court of Montgomery County, Texas.  Since mandamus is an exercise of original jurisdiction, this Honorable Court cannot review the Ninth Court of Appeal's action under a petition for discretionary review; therefore, Davis has no other remedy at law other than to seek a mandamus

---

[11] Appendix "B" Order dated 4 August 2014 signed by Judge Case

action against the Ninth Court of Appeals at Beaumont. *Padieu*, 392 S.W.3d at 117.

## B. RELATOR HAS A CLEAR RIGHT TO RELIEF

In order for mandamus to issue, the District Attorney and District Clerk must show that "there [was] no other adequate remedy available and that the act sought to be mandated [was] a ministerial act." *Washington v. McSpadden*, 676 S.W.2d 420, 422 (Tex. Crim. App. 1984).[12] An action is considered to be "ministerial" when the law clearly spells out the duty to be performed and does so with such certainty that nothing is left to the exercise of discretion or judgment. *Texas Dept. of Corrections, Etc. v. Dalehite*, 623 S.W.2d 420, 424 (Tex. Crim. App. 1981). Mandamus cannot issue to compel an act that is to any degree discretionary or debatable, *State ex rel. Wade v. Mays*, 689 S.W.2d 893, 898 (Tex. Crim. App. 1985), and a ruling on a pure question of law is not subject to mandamus review if that law is unsettled or uncertain. *State ex rel. Bill Hill v. Court of Appeals*, 67 S.W.3d 177, 180 (Tex. Crim. App. 2001) (Finding legal issue of first impression too debatable to be subject of mandamus).

Davis agrees that the District Clerk had no other remedy available at law; therefore, the writ of mandamus was the correct manner to challenge the trial

---

[12] The District Attorney was not ordered to produce anything and is not really a real party in interest. (See Appendix B Order Signed 8/4/2014 by Judge Case.)

court's order. However, the mandamus should not have been conditionally granted by the Ninth Court of Appeals because the trial court did not abuse its discretion and the trial court did not violate a ministerial duty. The District Clerk did not satisfy both prongs of the two part test.

**1. The Trial Court's order to produce the addresses of all jurors summonsed during 2013 was not a "ministerial" act because the Montgomery County Electronic Jury Selection Plan gives the Trial Court the authority to view the address data ordered to be produced.**

An action is considered to be "ministerial" when the law clearly spells out the duty to be performed and does so with such certainty that nothing is left to the exercise of discretion or judgment. *Dalehite*, 623 S.W.2d at 424. Mandamus cannot issue to compel an act that is to any degree discretionary or debatable, *Mays*, 689 S.W.2d at 898. In this case, the Trial Court's August 4, 2014 Order was not a violation of a ministerial act because the Montgomery County Electronic Jury Selection Plan gives the Trial Court the authority to view the data.[13]

The Trial Court ordered the District Clerk to provide address data in electronic form of all individuals summoned for jury duty during 2013.[14] The

---

[13] F.    Selection of Jurors:  (Gov't Code 62.011)

(Page 7 of 9) ... The person/vender shall transmit the original summarized jury list containing the names and addresses of all prospective jurors summoned for each date of appearance to the Jury Coordinator. The Jury Coordinator/representative shall deliver such list to the County Clerk's Office for filing. **A duplicate copy shall be retained by the Jury Coordinator, to be viewed at the Judge's discretion**."

[14] Appendix B Order Signed  8/4/2014 by Judge Case.

names of persons who will be summoned for jury service are electronically chosen from the Jury Wheel (*see* [www.mctx.org/dept/departments_d/district_clerk/jury_service.html](www.mctx.org/dept/departments_d/district_clerk/jury_service.html)*).* This website states that the list of those summoned is compiled from Texas Driver's Licenses and Voter Registration lists, which are both public data sources and which are not confidential.[15]

The Plan specifically provides in Subsection F that the list containing the names and addresses of **all** prospective jurors summoned **shall be retained to be viewed at the Judge's discretion**. The Trial Court's order states that the address data of all jurors summoned during 2013 shall be turned over to the defense experts under a confidentiality agreement to test whether there is a systematic exclusion of African-American citizens from jury service. Given that the Trial Court is authorized under the Plan to view the list, it is not unreasonable to contend that the Trial Court possesses the discretion to permit the juror address data to be

---

[15] The Plan provides that the sources of the names for the Jury Wheel are as follows:
A. Sources
The sources from which all names shall be taken is the current voter registration lists from all precincts in Montgomery County and all names on a current list to be furnished by the Department of Public Safety showing the citizens of Montgomery County who hold a valid Texas Driver's License and the citizens of the County, other than persons who are disqualified from Jury service, who hold a valid personal identification card or certificate held by the Department of Public Safety, except those exempt from jury service as provided by Sections 62.108 and 62.109 of the Government Code; and further provided that at any stage of this plan the voter registrar of Montgomery County, the Department of Public Safety, the Secretary of State, or the Montgomery County District Clerk may remove from Jury Service duplications of any citizen's name, or the name of any citizen who is disqualified from jury service, such as felons or aliens.

viewed by experts under a confidentiality agreement. The Ninth Court of Appeals should not have conditionally granted the mandamus against the Trial Court for the August 4, 2014 Order because the Trial Court's Order was within its discretion. *See Mays*, 689 S.W.2d at 898.

In sum, because the Plan authorizes the Trial Court to view the data which it ordered to be turned over to Dr. Karl Eschbach and Mr. Max Beauregard under confidentiality agreements and because the data already exists this was not a ministerial act and the Ninth Court of Appeals should not have issued mandamus relief.

**2. The Trial Court did not abuse its discretion.**

**A. The order to produce limited juror address data did not violate Article 35.29 of the Code of Criminal Procedure nor Section 62.0132 of the Government Code. The Trial Court's Order was discretionary, not a ministerial act; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued.**

The Court of Appeals for the Ninth District of Texas at Beaumont incorrectly applied the law. The Beaumont Court equated the <u>information used to summons</u> a juror with the <u>information provided by the juror</u> when answering the juror questionnaire.[16] As a result, the Beaumont Court wrongly found that the "name, address, juror number and TDL or voter registration number on the

---

[16] Appendix D, Page 4 (the Memorandum)

12

front of the summons" is confidential under Section 62.0132 of the Texas Government Code.[17]  The Ninth Court of Appeals concluded that the juror summons information provided by the Secretary of State and by the Department of Public Safety is confidential when none of the juror summons data ordered to be disclosed is labeled as "confidential" by the Texas Legislature.  At Page 5 of the Memorandum Opinion, the Court stated:

> *Davis argues that each summoned juror's address is not confidential in this context, because the questionnaire itself is not being disclosed. Montgomery County's jury selection plan states that the information retained by the District Clerk's Jury Coordinator is a computer printout of "the specified number of prospective jurors with their name, address, juror number and TDL or voter registration number on front of the summons." This is the confidential information mentioned in section 62.0132 of the Texas Government Code and article 35.29 of the Texas Code of Criminal Procedure. See Tex. Gov't Code Ann. § 62.0132; Tex. Code Crim. Proc. Ann. art. 35.29.[18] The jurors' personal information is not transformed from confidential to public information even though under Montgomery County's jury selection plan the District Clerk prints a "summarized jury list containing the names and addresses of all prospective jurors summoned for each date of appearance" and a judge who requested a jury is allowed to see the printout.*

---

[17] Appendix D, Page 5 (the Memorandum)

[18] Davis did not argue, in this Court or in the trial court, that he presented good cause for the trial court to order disclosure of personal information about jurors. See Tex. Code Crim. Proc. Ann. art. 35.29(b) (West Supp. 2014).

13

There is a distinction between **(a)** a person who is summoned for jury service, **(b)** a person who responds to such a summons and is included in a venire, and **(c)** a person who actually is selected from a venire to serve on a jury. *See Ruiz-Angeles v. State*, 351 S.W.3d 489, 496 (Tex.App.— [14th Dist.] 2011) (pet. refused).

Persons who are summoned for jury service are also provided a written jury summons questionnaire ("questionnaire"). The questionnaire is to be completed by the person who responds to the summons and is included in the venire. The **summons** is separate and distinct from the **questionnaire**. The **summons data** is provided by the Texas Secretary of State and Texas Department of Public Safety. The **questionnaire data** comes from the person who responds to the summons.

Accordingly, Article 35.29 of the Code of Criminal Procedure and Section 62.0132 of the Government Code do not apply to this case. Article 35.29 of the Code of Criminal Procedure restricts the disclosure of information obtained from jurors by means of juror questionnaires. Section 62.0132 of the Government Code provides for the confidentiality of such information contained in juror questionnaires and provides for limited disclosure. Both of these provisions deal with information obtained from jurors responding to questionnaires and these statutory provisions should not be expanded to include the data ordered disclosed in this case, namely, the addresses from all jurors summoned in 2013.

When construing a statute, a reviewing court should determine and give effect to the legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If the meaning of the statutory language is unambiguous, a reviewing court adopts, with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms. *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865-66 (Tex. 1999). If a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity. *Id.* at 866. When interpreting a code enacted by the legislature, the Court should read words and phrases in context and construe them according to the rules of grammar and common usage. Tex. Gov't Code Ann. § 311.011(a). If words are not defined, they are given their plain and common meaning, unless the context of the statute indicates a contrary intention or it leads to an absurd result. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008).

In *Simmons v. Arnim*, 110 Tex. 309, 324, 220 S.W. 66 (Tex. 1920)*,* the Texas Supreme Court discusses a court's duty when reviewing, addressing and accepting the plain, unequivocal statutory language:

> Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not

15

forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

Id. At 70.  In *Byke v. City of Corpus Christi,* 569 S.W.2d 927, 932 (Tex.Civ.App. -- Corpus Christi 1978), the Thirteenth Court of Appeals  also stated that, "When the courts abandon the plain, ordinary and customary meaning of words in common usage, statutory construction rests upon insecure and obscure foundations at best."  In *Miles v. State, 157 Tex.Crim. 188, 247 S.W.2d 898, 899 (1952)* this Honorable Court stated that, "This court, under the guise of statutory construction, cannot write into the statute that which is not contained therein."  Davis contends that the address information used to summons a prospective juror is not confidential as held by the Ninth Court of Appeals.

a.  **Article 35.29 of the Code of Criminal Procedure was not violated in this case because the juror address data is not to be collected from any juror questionnaire or information supplied during the voir dire process.**

Article 35.29 of the Code of Criminal Procedure protects information collected during the jury selection process from potential jurors.  The Article provides for limited disclosure.  The Order in this case had nothing to do with information collected from persons who serve as a juror or appear during the venire process.  The Order relates to all jurors summoned in 2013 (those who were mailed a summons) and is limited to the juror address data alone.  Thus, Article

16

35.29 does not apply because the addresses to be reviewed by the experts relate to the jury summoning process, not the jury selection process[19].

**b. Section 62.0132 of the Texas Government Code is not violated in this case because the address data is not being collected from a jury questionnaire.**

Section 62.0132 of the Texas Government Code protects information contained in jury questionnaires. The Order in no way relates to information contained in jury questionnaires. No information from juror questionnaires is being requested; therefore, Section 62.0132 is wholly inapplicable.[20]

**c. The address data of those summoned is not protected information.**

**i. The addresses of those jurors summoned are available from public sources.**

The August 4, 2014 Order only orders the District Clerk to turn over the addresses of those persons summoned during 2013.[21] Moreover, the information is being given to retained experts under confidentiality agreements.[22] The addresses of those registered to vote in the county are easily obtainable through the Montgomery County Elections Administration.[23] All that is required to obtain the names and addresses of every person registered to vote in Montgomery County is

---

[19] Section 62.0132(f), Texas Government Code makes juror supplied information obtained through questionnaires confidential and does not address the summons process.
[20] Article 35.29(a), Texas Code of Criminal Procedure, provides that information collected by the court or a prosecuting attorney during the jury selection process….is confidential.
[21] Appendix B Order Signed 8/4/2014 by Judge Case.
[22] Appendix B Order Signed 8/4/2014 by Judge Case.
[23] See http://www.mctx.org/election/

17

for a request to be made. The information is then available for download immediately and no fee is required for this service.[24]

Given that the jury list is compiled using the voter registration list and that the names and addresses of all on the jury list are available publicly, it was not an abuse of discretion for Trial Court to order <u>just the addresses</u> of those summoned to be turned over to the defense experts under confidentiality agreements. In fact, the juror address information is more protected under the trial court's order than other methods by which such information is typically made available to the public.

ii. **The private vendor given the juror information is not under a confidentiality agreement; however, the experts in this case will be subject to a Confidentiality Agreement.**

The Plan provides for a person or vendor to print out the summons for jurors after a request for jurors has been made.[25] The Plan does not state whether this person or outside vendor is under any type of confidentiality requirement. Yet, once again, the trial court's August 4, 2014 Order does provide for the addresses to be given to the retained experts under a confidentiality agreement.[26] The Order further provides for the addresses data to "only be used for the purposes stated in this Order and not disseminated or shared with any other person or entity."[27]

_____

[24] See http://www.mctx.org/election/
[25] Appendix C (The Plan)
[26] Appendix B Order Signed 8/4/2014 by Judge Case.
[27] Appendix B Order Signed 8/4/2014 by Judge Case.

**iii**.    **The Jury Selection Plan states that the Judge has discretion to review the list of all summoned prospective jurors and the Judge has appointed experts to review only the jury address data.**

The Plan states that the jury list containing the names and addresses of **all** prospective jurors summoned for each date of appearance **shall** be retained **to be viewed at the Judge's discretion**.[28]  Given that the Trial Court can view the list, it is not unreasonable that the Trial Court may permit experts to view the data in the Trial Court's place in order to conduct a study.

In sum, only the addresses of those summoned for jury duty in 2013 is in contention.  Those persons registered to vote in Montgomery County are already subject to having their <u>names and addresses</u> given out upon a public information request that is available to be online at no charge.  The trial court's order does not order names to be disclosed.  Just addresses.  Given that the Trial Court can view the list itself, it is not offensive for retained experts under confidentially agreements to see the addresses of those summoned for jury during 2013.

**B. The Trial Court has authority over the District Clerk of Montgomery County; therefore the Trial Court's Order to turn over address data was not an abuse of discretion and mandamus relief should not have issued.**

As held in *United States of America v. Kaboni Savage, Robert Merritt, Steven Northington, Kidada Savage*, 2012 U.S. Dist. LEXIS 142844 (E.D. Pa., 2012), the Clerk of the Court is the party who holds the juror information

---

[28] Appendix C, Page 8 (the Plan)

requested and the party who "bears the burden" of providing the defendant with access to the juror information. *See Id.* at 21. The Court in *United States of America v. James Stile*, 2014 U.S. Dist. LEXIS 65390 (D. Me., 2014) also ordered the Clerk of the Court to provide the defense with juror information. Accordingly, in this case, the trial court did have the authority to order the clerk of the court, the Montgomery County District Clerk, to provide the defense with the address data.

Furthermore, the trial court has authority over the District Clerk pursuant to Section 62.011(b)(4) of the Texas Government Code, the Plan, and according to the compulsory process clause of the Sixth Amendment to the U.S. Constitution.

1. **§62.011(b)(4) of the Texas Government Code and Montgomery County Electronic Jury Selection Plan Sections (B), (E), and (F) all provide that the District Clerk is the agent of the District Court.**

The District Clerk was ordered to produce information which the District Clerk possesses as a result of her official designation. The Plan provides:

> B. Official in Charge: (Gov't Code Sec. 62.001, b-1)
>
> **The District Clerk of Montgomery County, Texas is <u>designated</u> as the official in charge of the Montgomery County Jury Selection process**...

E.    Presiding Judge/Appointee:   (Gov't Code Sec. 62.011, 62.110-b)

**The District Clerk, <u>appointed</u> by the Presiding Board of Judges** on August 5, 2005...

F.    Selection of Jurors:  (Gov't Code 62.011)

Each week or month, or three (3) weeks prior to requested appearance, the Court Coordinator, **<u>under the direction</u> of the Judge of each County and District Court** shall submit to the District Clerk Jury Coordinator a Court's "Request for Jurors." (Being form #2 of the Jury Pool Guidelines).  The request shall specify the following:

1. dates of appearances;
2. number of jurors to appear for each date;
3. appearance time for each date; and
4. the Courtroom or place designated as a Courtroom or assembly area for jurors to appear on each date.

On Thursdays of each week, the Jury Coordinator or representative will calculate from the timely filed requests, the specified number of jurors to appear three weeks away.  The Jury Coordinator shall electronically transmit these requests to the designated person/vendor.  The designated person shall cause their computer to print out the specified number of prospective jurors with their name, address, juror number and TDL or voter registration number on front of the summons.  These summons shall be placed in the mail within two (2) days from the date of request by jury coordinator, per designation of the Sheriff.  The person/vender **shall transmit the original summarized jury list containing the names and addresses of <u>all</u> prospective jurors summoned for each date** of appearance to the Jury Coordinator.  The Jury Coordinator/representative

shall deliver such list to the County Clerk's Office for filing. **A duplicate copy <u>shall</u> be retained by the Jury Coordinator, <u>to be viewed at the Judge's discretion</u>.**"

The Montgomery County Jury Selection Plan [29] (Emphasis added). Each of the above provisions show the District Clerk is essentially the agent of the trial court.

The District Clerk already possesses the data in the form the District Clerk was directed to produce.[30] It is as a result of the designation by a majority of the Judges of District Court of Montgomery County, Texas, that the District Clerk is the official who handles juror data and is designated as the official in charge of the Montgomery County Jury Selection Process. In this specific capacity, the District Clerk is under the direction of the District Judges and this designation was made under the provision of Section 62.011 of The Texas Government Code.

2.    **The District Clerk consented to the District Court's personal jurisdiction.**

Not only is the District Clerk the agent of the District Court Judges, but the District Clerk waived any argument to jurisdiction over her office when she filed her Motion for Protective Order [31] and when she appeared through counsel at the

---

[29] Appendix C (the Plan), (B), (E), and (F).
[30] Appendix C (The plan) (F)
[31] Appendix E (Motion for Protective Order)

hearing on May 21, 2014.  *See Ins. Corp. of Ir. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 703 (U.S. 1982).

**3.    The electronic data ordered to be produced, already exists.**

The Trial Court's Order states:

> "IT IS ACCORDING ORDERED that the District Clerk of Montgomery County produce to the experts appointed by this Court in this cause, to-wit: Dr. Karl Eschbach, and Mr. Max Beauregard, the address data of all jurors summoned for jury duty during the calendar year 2013 in electronic form. ..."[32]

The August 4, 2014 Order provided only the address data of all jurors summoned be given to the experts.  The Order further stated that the experts must execute confidentiality agreements to ensure the data will only be used for the expert's limited purpose of determining whether there is a systematic exclusion of African-American citizens from jury service in Montgomery County, Texas.  The address data of all prospective jurors who were summoned during 2013 already exists.  Section F of the Montgomery County Electronic Jury Selection Plan at page 8 of 9 provides that the "summarized jury list containing the names and addresses of all prospective jurors summoned for each date of appearance" will be filed with the County Clerk's office and "A duplicate copy shall be retained by the Jury Coordinator, to be viewed at the Judge's discretion."  Therefore, the Trial

---

[32] Appendix A

Court's Order calling for the production of juror address data of those summoned in 2013 already exists in an electronic format. The County Clerk and Jury Coordinator both have a copy of the address information, although the juror's name must be removed, but the information already exists and should be easily obtainable. Furthermore, the Plan provides that the Judge may view said jury list at his discretion. Given that the address data exists and is subject to be reviewed by the Judge (or the experts he has appointed), it is not an undue burden for the District Clerk to produce the address data in electronic format.

**C.** **Article 39.14 of the Texas Code of Criminal Procedure is inapplicable case as the requested juror address data is not in possession of the District Attorney nor any of his agents; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued.**

The District Attorney of Montgomery County argued that the broad discovery provision in Article 39.14 of the Texas Code of Criminal Procedure establishes that the Trial Court cannot issue the order for juror addresses. Davis agrees in as much as the discovery statute is not on point in this case because the District Attorney nor any agent or representative of the State possess the address data. The juror address data is in the possession of the District Clerk and the Code of Criminal Procedure is not on point.

**D. The Compulsory Process Clause authorizes the Trial Court's action; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued.**

Davis further contends that under the compulsory process clause of the Sixth Amendment to the U.S. Constitution, the trial court has the authority to issue an order to secure petit juror information. Davis has presented evidence questioning the fair and reasonable representation of African-Americans in the jury selection process. The Sixth Amendment to the U.S. Constitution provides for trial by an "impartial jury of the State and district wherein the crime shall have been committed". The Sixth Amendment further guarantees that a defendant may call witnesses on his behalf and compel a witness's presence by subpoena. Davis argues that the compulsory process clause also guarantees that a court has the power to issue an order for the District Clerk to produce juror address data.

**E. The juror address information is needed to ensure that Defendants in Montgomery County are tried by a Constitutionally valid jury; therefore, the Trial Court did not abuse his discretion and mandamus relief should not have issued.**

"It is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury, or before a petit jury, from which all persons of his race or color have, solely because of that race or color, been excluded by the State, whether acting through its legislature, its courts, or its executive or administrative officers." *Hernandez v. Texas*, 347 U.S. 475, 477 (U.S. 1954). Davis's position is not that there must be African-Americans on each jury panel of Montgomery County, but the limited research already conducted and

the testimony of seasoned criminal defense attorneys in Montgomery County shows there is a breakdown in the jury summonsing process and the address data is needed.

The Fourteenth Amendment requires that equal protection must be given to all. U.S. CONST. amend. XIV, § 1; Tex. Const. art. I, §§3, 19. Additionally, the Sixth Amendment requires that the selection of a petit jury must come from a cross-section of the community that fairly represents that community. U.S. CONST. amend. VI. Combined, the two provisions provide every person with the right to be tried by a jury that fairly represents the community in which he is tried.

**1.** **The Fourteenth Amendment requires that equal protection must actually be given to all and not merely an empty promise.**

The Fourteenth Amendment requires that equal protection must be given. U.S. CONST. amend. XIV, § 1; Tex. Const. Art. I, §§3, 19. This right is not just another empty promise on a cherished piece of paper; it is a right that has "bite." "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith v. Texas*, 311 U.S. 128, 130 (U.S. 1940). "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of

a democratic society and a representative government. [33] *Id.* "The fact that the written words of a state's laws hold out a promise that no such discrimination will be practiced is not enough." *Id.* "The Fourteenth Amendment requires that equal protection to all must be given – not merely promised."

Following this line of reasoning from the United State Supreme Court as quoted herein, it follows that just because the laws of this State set forth a mechanism of selecting members of the Montgomery County population for the petit jury, and those mechanisms alone do not appear to be discriminatory that does not mean discrimination is not occurring in Montgomery County, Texas. The Fourteenth Amendment requires that equal protection must actually be given; a promise of equal protection is not good enough. *See id.* That is why it is so important in this case for this Honorable Court to overturn the mandamus granted by the Ninth Court of Appeals. The Trial Court found, after hearing arguments of counsel, examining the pleadings, and hearing the testimony given, that there does appear to be a problem with the Montgomery County jury system. The juror address data covered by the Trial Court's order is to investigate the jury system of Montgomery County and to ensure that equal protection is being given to the

---

[33] "No citizen possessing all other qualifications ... shall be disqualified for service as grand or petit juror in any court of the Unit States, or of any State, on account of race, color, or previous condition of servitude; ..." 18 Stat. 336, 8 U.S.C. §44."

citizens of Montgomery County. This information is needed to ensure that the Fourteenth Amendment has not been turned into an empty promise.

In this case, when the Trial Court ordered the District Clerk to give to Davis' experts the addresses of prospective jurors summoned during 2013 under confidentiality agreements, the Trial Court did not abuse its discretion. Instead, the Trial Court was taking steps to ensure that the defendant is, in fact, getting equal protection under the laws of this State. In light of the evidence from the May 2014 hearing, the Trial Court's order allows the defense the opportunity (1) to test the fairness of the jury summonings system of Montgomery County and (2) to prove that the summonings system of jurors does not provide a random and fair cross-section of the community.

2. **The Sixth Amendment right to a jury trial requires selection of a petit jury from a representative cross section of the community.**

The Supreme Court of the United States has found that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (U.S. 1975). Encompassed among a defendant's right to trial by jury is the right to a petit jury that is selected "at random from a fair cross section of the community in the district ... wherein the court convenes." *Id.* at 529, citing 28 U.S.C. §1861. Having a jury that comes from a fair cross-section of the

community is "fundamental to the American system of justice." *Id.* at 530. The right to have a trial by jury "presupposed a jury drawn from a pool broadly representative of the community...." *Id.*

In order to make a prima facie showing that the jury selection process violates the fair cross-section of the community requirement of the Sixth Amendment, a Defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community: (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systemic exclusion of the group in the jury selection process. *Missouri v. Duren,* 439 U.S. 357, 364 (U.S. 1979).

In this case, the group being is excluded, African-Americans, is a distinctive group. *Ramseur v. Beyer,* 983 F. 2d 1215, 1230 (3d Cir. 1992). Davis has elicited testimony that the representation of African-Americans in the jury selection process is not fair and reasonable considering the number of such persons in the community. Davis sought the information ordered disclosed by the trial court show a statistical disparity between the venire and the population of the county.

The *United States of America v. Kaboni Savage, Robert Merritt, Steven Northington, Kidada Savage*, 2012 U.S. Dist. LEXIS 142844 (2012) is a federal

case similar to the case at hand.  In that case, the African-American defendant believed the racial makeup of the Eastern District of Pennsylvania, when compared to Philadelphia County, did not represent a fair cross-section of the community. *Id.* at 2-5.  The defendant was relying on census data to show the dilution of African-Americans, but "use of census data alone is insufficient to establish a constitutional violation."  *Id.* at 12 citing *United States v. Murphy*, 464 F. App'x 60, 63 (3d Cir. 2012).  Therefore, the defendant was seeking disclosure of a host of things related to the jury summonsing process and the Government was refusing to disclose any information that exposed personal information of prospective jurors. *United States of America*, 2012 U.S. Dist. LEXIS 142844 at 14-16.

While analyzing the requested information in light of the law regarding a jury selection process that violates the fair cross-section of the community requirement of the Sixth Amendment, the Court held that making the prima facie showing "requires a showing of a statistical disparity between the entire venire and the population of the district."  *Id.* at 17 citing *United States v. Weaver*, 267 F.3d 231,240 (3d Cir. 2001) ("Noting that proof of a fair cross-section claim is a 'mathematical exercise, and must be supported by statistical evidence").  A federal statute on point "makes clear that a litigant has essentially an unqualified right to inspect jury lists and grants access in order to aid parties in the preparation of motions challenging jury-selection procedures."  *United States of America*, 2012

30

U.S. Dist. LEXIS 142844 at 18-19; *See 28 U.S.C. §1867(f); See also United States v. Test*, 420 U.S. 28, 29-30 (1975). While this is "not a license for litigation to rummage" through jury records, it does afford inspection to complete a determination of whether the jury is being selected at random from a "fair cross-section of the community." *United States of America*, 2012 U.S. Dist. LEXIS 142844 at 19-20. While the Court held it would not provide the source lists, it did state that the Defendant was entitled to receive "spreadsheets containing the information he seeks." *Id.* at 21.

Given that defendants have the right to be tried by a jury that fairly represents their community, *see id.*, in this case, the Trial Court did not abuse its discretion when it ordered the District Clerk to turn over the address data. The 2013 address data will be used by the experts to determine if the number of African-Americans summoned for jury process in Montgomery County reflects the African-American population in Montgomery County. Just like in *United States of America v. Kaboni Savage, Robert Merritt, Steven Northington, Kidada Savage*, the defense in this case needs the statistical evidence to accompany the census data it has gathered and experts it has retained. The information in the District Clerk's possession will either confirm or rule out a statistical disparity between the population of Montgomery County and the entire venire.

The *Hernandez* Court said, "Circumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period. But it taxes our credulity to say that mere chance resulted in there being no members of this class among the over six thousand jurors called in the past 25 years. The result bespeaks discrimination, whether or not it was a conscious decision on the part of any individual jury commissioner." *Hernandez*, 347 U.S. at 482. Davis's maintains that there is a systematic exclusion of African-Americans on jury panels in Montgomery County, Texas. Davis is not claiming that there must be a certain number of African-Americans on each panel, but given the testimony from the May 21, 2014 hearing and the limited research already complied by the experts, there is something wrong with the Montgomery County jury selection process and it needs further investigation and the address data of jurors summoned for 2013 to be provided. The mandamus conditionally granted by the Ninth Court of Appeals should be overturned by this Honorable Court.

**F. The Constitutional complaint is ripe and valid; therefore, the Trial Court did not abuse its discretion and mandamus relief should not have issued.**

At the hearing on May 21, 2014 regarding Davis's Motion for Disclosure of Information, the defense called nine witnesses to support disclosing the addresses of summoned jurors to the retained experts in an effort to show there is a demonstrable and noticeable absence of African-Americans in the jury panels of

Montgomery County, Texas.[34] Of the nine witnesses, seven were attorneys who practice primarily in Montgomery County, Texas, all with a lengthy history of practicing criminal law. The sum of their testimony is that it is very rare for people of African-American decent to appear in the jury pool.[35] Dr. Karl Eschbach testified that if you take a jury pool of 60 people, only seven percent (7%) of those jury pools should have <u>no</u> African-American representatives.[36] However, the testimony of the lawyers who have had substantial criminal practice in Montgomery County stated it was not uncommon to have no African-American representatives in about fifty percent (50%) of cases tried in Montgomery County.[37]

Based on the limited information already available to Davis, there appears to be a systematic exclusion of African-Americans in the jury selection process given that only 7% of cases should have no African-Americans in the jury pool and the testimony at the hearing establishes that approximately 50% of jury pools with no African-Americans represented. Davis has used the correct procedures in this case because he "need only allege that he is preparing a motion to challenge the jury selection process in order to 'avail himself of the right of access to jury selection

---

[34] Appendix A, Reporter's Record, Vol. 1, pg 3
[35] Appendix A, Reporter's Record, Vol 1., pg. 21-64; 99-105.
[36] Appendix A, Reporter's Record, Vol, 1, pg 80
[37] Appendix A, Reporter's Record, Vol 1., pg. 21-64; 99-105 and pg 80.

records'." *United States v. Royal,* 100 F.3d 1019, 1025 (1ˢᵗ Cir. 1996). Furthermore, Davis's constitutional complaint is recognizable and there was evidence produced at the hearing showing there seems to be exclusion of a distinctive group of jurors in Montgomery County. *See Duren*, 439 U.S. at 364.[38]

**1. Because Davis is not seeking information from questionnaires, his challenge is not premature.**

Davis's claim for juror information is ripe for review. Davis is not challenging the array in his case. The challenge is to the jury summoning process in Montgomery County as a whole. The defense is attacking at the forefront of this case the problems with the Montgomery County jury panels, instead of waiting for the jury panel to walk into the court room, a recess be called and then all of this research commence. Davis is not requesting juror information from questionnaires; therefore, his challenge is not to the array and is not premature.

**2. Evidence produced at the May 21, 2014 hearing demonstrates there is an apparent exclusion of African-Americans in the jury summonsing process.**

---

[38] The difference in the August 4, 2014 Order from the prior order in 2013 is that this time Davis did produce evidence at the hearing suggesting Montgomery County has a practice that results in the exclusion of African-Americans and it could be the result of juror summons not going to the portion of the county where the majority of this race reside. If the addresses alone are given to the experts, they can lay that information over the 2010 census maps and see if the correct percentage of jury summons are going to those particular areas. The address data will show whether African-Americans are being excluded based on their location in the community. Additionally, the claim is not prospective this time around because the information Davis seeks is not from jury questionnaires, but rather from the summoning process itself.

The Order in contention requires the production of the addresses of all jurors summoned in 2013.[39] The defense made a prima facia showing at the hearing that there is a noticeable absence of African-Americans in the jury panels of Montgomery County.[40] Dr. Eschbach testified he believed there was at least a basis to conduct research to investigate the under-representation of African-Americans on jury pools in Montgomery County.[41] He further testified he has the ability to take the address data and compare it to the 2010 census information to conduct a scientific, statistical analysis to determine if the jurors summoned are consistent with the representation of African-Americans in Montgomery County.[42]

**PRAYER FOR RELIEF**

Relator respectfully requests this court to issue mandamus relief against the Ninth Court of Appeals at Beaumont.

---

[39] Appendix A
[40] See generally Appendix A, Reporter's Record
[41] Appendix A, Reporter's Record, Vol. 1, pg 73-74.
[42] Appendix A, Reporter's Record, Vol, 1, pg 74-75.

**RESPECTFULLY SUBMITTED,**

**BRASS & McCOTTER**
**207 SIMONTON**
**CONROE, TEXAS 77301**
**rbrass1@yahoo.com**
**Tel (936) 788-5700**
**Fax (936) 788-5701**

**By:** *Rick Brass* _____
    **RICK BRASS**
    **Texas Bar No. 02909450**

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing instrument were mailed to the Respondent and counsel for the real parties in interest on the date of the mailing of the original to the Clerk of this Court.

*Rick Brass*
_____
**RICK BRASS**

# VERIFICATION

BEFORE ME the undersigned authority this date personally appeared **RICK BRASS**, who after being sworn by me did state upon his oath the following:

I, RICK BRASS, do hereby swear and affirm that the facts stated above are true and correct based on personal knowledge.

*Rick Brass*
_____
**RICK BRASS**

SUBSCRIBED AND SWORN TO before me this __28th__ day of _____January_____ 2015.

*Emily S. Knez* Commission Expires 3/20/2015.30
_____
**NOTARY PUBLIC – STATE OF TEXAS**

EMILY S KNEZ
NOTARY PUBLIC
My Commission Expires
March 20, 2015
STATE OF TEXAS

37

# **APPENDICES**

Appendix A - Reporter's Record ..................................................2, 3, 4, 6, 23, 33, 35

Appendix B - Order dated 4 August 2014 signed by Judge Case .......3, 9, 10, 17, 18

Appendix C - Jury Selection Plan.........................................................4, 18, 19, 22

Appendix D - Memorandum.........................................................................12, 13

Appendix E - Motion for Protective Order.............................................................22

Appendix A - Reporter's Record

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. 13-05-05517-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| | ) | |
| | ) | |
| | ) | |
| VS. | ) | MONTGOMERY COUNTY, TEXAS |
| | ) | |
| | ) | |
| LEON DAVIS, | ) | |
| | ) | |
| Defendant. | ) | 9TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HEARING ON DEFENDANT'S MOTION FOR
DISCLOSURE OF INFORMATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 21st day of May, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Kelly W. Case, Judge presiding, held in Conroe, Montgomery County, Texas. Proceedings reported by machine shorthand.

APPEARANCES


Mr. Andrew D. James
SBOT NO. 24060997
Mr. William J. Delmore
SBOT NO. 05732400
MONTGOMERY COUNTY DISTRICT ATTORNEY'S OFFICE
207 West Phillips, Second floor
Conroe, Texas  77301
Phone:  (936) 539-7800
ATTORNEYS FOR THE STATE OF TEXAS


Mr. Stuart A. Hughes
SBOT NO. 24041151
MONTGOMERY COUNTY ATTORNEY'S OFFICE
501 North Thompson, Suite 300
Conroe, Texas  77301
Phone:  (936) 539-7828
ATTORNEY FOR MONTGOMERY COUNTY


Mr. Rick Brass
SBOT NO. 02909450
BRASS & MCCOTTER
207 Simonton
Conroe, Texas  77301
Phone:  (936) 788-5700
ATTORNEY FOR LEON DAVIS

I N D E X

VOLUME 1

(HEARING ON DEFENDANT'S MOTION FOR DISCLOSURE OF

INFORMATION)

May 21, 2014

|  | Page | Vol. |
|---|---|---|
| Proceedings | 4 | 1 |

STATE'S WITNESSES
(None)

COUNTY ATTORNEY'S WITNESSES
(None)

DEFENDANT'S WITNESSES

| | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Lydia Clay-Jackson | 21 | 27 | | 1 |
| E. Tay Bond | 29, 36 | 34 | | 1 |
| Jerald Crow | 38, 46 | 44 | | 1 |
| Patricia Maginnis | 47 | 53 | | 1 |
| Brian Burns | 56 | | | 1 |
| Ray Stokes | 64, 66 | 66 | | 1 |
| Karl Eschbach | 68, 89 | 80, 83 | | 1 |
| Max Beauregard | 90 | | | 1 |
| Gilbert Garcia | 99 | 105 | | 1 |

| |  | Page | Vol. |
|---|---|---|---|
| Defendant rests | | 107 | 1 |
| Both sides close | | 107 | 1 |
| Adjournment | | 124 | 1 |
| Court Reporter's Certificate | | 125 | 1 |

EXHIBIT INDEX

(None)

(Open Court. Defendant and all parties present)

THE COURT: Let me -- Mr. Brass?

MR. BRASS: Yes, Your Honor.

THE COURT: Help me, get me up to speed on where we are. I know I've got your application for deposition. I'm trying to find in there your filings.

MR. BRASS: Judge, for the record, let me announce that I'm formally withdrawing and abandoning my request to take anyone's deposition.

THE COURT: Okay.

MR. BRASS: I'm formally withdrawing and abandoning my motion to change venue.

THE COURT: I don't have that.

MR. BRASS: It's deep in one of the files. It was an early motion that was part of the basis for the previous ruling and that was overturned by the Court of Appeals.

THE COURT: Okay. There is a lot in this file that's tabbed.

MR. BRASS: Right.

THE COURT: So give me a second and see if I can put my hands on it. Do you know about when you filed that? Okay. I've got it. May 15th, 2013, motion for change of venue.

MR. BRASS: Yes.

THE COURT: So you're withdrawing that at this time?

MR. BRASS: Yes, Your Honor. I'm abandoning and withdrawing any requests for any juror questionnaire material the -- it was issues previously about 600 -- I think 600 pieces of information we were requesting. It was E-jury information. I'm abandoning all of that. And today the only thing that I'm going forward on is the pending motion to produce juror address data.

THE COURT: Okay. Was that filed back in 2013 as well or is that recent?

MR. BRASS: It was this year I believe, Judge. Give me a second. On or about November 12th of '13.

THE COURT: Motion challenging the jury summoning based on racial bias?

MR. BRASS: Yes, just following that motion to produce juror address data.

THE COURT: I have it standing on its own. All right. Just your application for your deposition of witnesses is also been abandoned and withdrawn?

MR. BRASS: Yes, Judge. The motion to

produce juror -- I'm sorry -- was filed March 4th, 2014.

THE COURT: I don't have my hands on that one yet. Let me find it. Motion for juror address data?

MR. BRASS: Yes, Your Honor.

THE COURT: Okay. Got it. Okay. So that's the only motion you're moving forward on today?

MR. BRASS: Yes. I will also say for the record that the information that I'm requesting in this motion is to support and enable me to proceed on the underlying motion which is challenging the jury summoning process of Montgomery County based on racial bias. I'm asking for the data so that I can support the basis of that motion. But the purpose of the hearing today in terms of what I've noticed the other side is simply the production of the address data.

THE COURT: Okay. Who's handling the case on the other side?

MR. HUGHES: Your Honor, Stuart Hughes from the County Attorney's Office on behalf of Montgomery County District Clerk's Office, specifically Brenda Shank and Ed Stokes were subpoenaed to be here today. I'll be speaking on their behalf. I have filed something in the opposition to the motion to produce

summoned jury address data.

MR. JAMES: Judge --

THE COURT: What did you file, Mr. Hughes?

MR. HUGHES: I filed on April 16th, 2014 District Clerk's response to Leon Davis' application for deposition which he just withdrew. But on April 17th, we filed District Clerk's Motion for Protective Order, Your Honor, regarding that motion to produce the jury address data.

THE COURT: Okay. I've got a protective order. All right. Anything else you filed, Mr. Hughes?

MR. HUGHES: That's it, Your Honor.

THE COURT: Okay. And then next --

MR. JAMES: Judge, Mr. Delmore and myself will be handling things on behalf of the District Attorney's Office. I know we filed a few responses as well. May 16th we filed State's response to Defense's motion to produce juror addressed data.

THE COURT: Okay. May 16th.

MR. JAMES: And then we filed, I believe, something else prior in regards to Mr. Brass's motion that he's just withdrawn. So --

THE COURT: Well, that kind of makes it

moot.

MR. DELMORE: Judge, Mr. James is going to do most of our advocacy today. But can I just ask one quick question of Mr. Brass?

THE COURT: Sure.

MR. DELMORE: Rick, you say you're not questioning any information from the juror questionnaires. You just want address data. But the address data you want is linked to the race of the prospective jurors?

MR. BRASS: No. That's incorrect.

MR. DELMORE: You don't care what the race is?

MR. BRASS: Correct, I do not. That's not what I'm asking for.

MR. DELMORE: All right. Because I was thinking you needed the questionnaires to get the racial data. All right.

THE COURT: So anything else to clear up?

MR. BRASS: If there is some confusion on their part as to what my premises is, I can cover that in a very brief opening statement.

THE COURT: First I want to make sure that I've got the motions and the responses to the motions lined up so I know what the arguments are, and

then I'll be glad to hear any testimony and anything else. But I'm trying to get a handle on -- this file is getting a little big, and there is a lot of loose filings that have been done in the last couple of months. So I want to make sure I know exactly what I'm addressing today. I've got your motion to produce juror address data. I've got State's response to defendant's motion to produce juror address data. And then I've got a Montgomery County District Clerk, Barbara Adamick's motion for protective order. Is that all I'm addressing today?

MR. BRASS: Judge, I was distracted for a second.

THE COURT: Don't get distracted, Mr. Brass. I'm trying to line all this up. Motion to produce juror address data, Mr. Brass. State's response to defendant's motion to produce juror address data, Mr. James; and Montgomery County District Clerk, Barbara Adamick's motion for protective order, Mr. Hughes; is that it?

MR. BRASS: As far as we understand, yes, Judge.

THE COURT: Okay. All right. Mr. Brass, your motion is pretty simple. You want to go ahead and tell me what you're arguing for?

MR. BRASS: Judge, we believe that there is a demonstrable and apparent disproportionate number of citizens of African-American decent on our jury panels. We do not know why that is occurring. We have come up with a hypothesis that the reason black members are not showing up on the jury panel is because there is a defect in the way jurors are summoned. In order to find out if that hypothesis is correct, if it can be demonstrated scientifically, we are asking for the district clerk to produce electronically the data of the summoned jurors for the year 2013. It is our intention -- we have experts here to testify about this -- that with that data we can overlay that data on to the 2010 census data, and the scientists will be able to discern whether the jury summoning process is racially neutral. And the only way to do that is with this electronic data. We are drawing a distinction between confidential juror information and electronic summoned juror address data. We believe that the clerks that are here to testify will testify that the jurors are summoned through an electronic data system, perhaps through an outside vendor and that jurors are summoned through the mail; and therefore, the data that we're seeking exists. We're not asking anybody to create it. We are simply asking them to share it with

us. We believe they have it. We believe that the laws of our state and our constitution and the case law support that we should be able to get it if we ask for it.

THE COURT: I have a feeling I'm missing a key element of what you're asking for because right now I don't see a distinction between what you're asking for now and what you asked for a year ago that was shot down by the Court of Appeals.

MR. BRASS: We are not asking for any information that is collected as part of the jury selection process.

THE COURT: Okay.

MR. BRASS: That's what they focused on. The confidential nature of information that the prosecutor, the Court, and clerk collect as part of the jury selection process. We are focused on the jury summoning process that the federal case law supports that a defendant is guaranteed the right to have his case tried in a system where the jury summoning process is racially neutral. If there is a class of citizens being systemically excluded for any reason, then that is illegal. The only way for us to find the answer to the question, "Is that happening here in Montgomery County" is to obtain this electronic address data and

apply it to the population data that our experts possess. So I think it's a very significant, important, and demonstrable distinction between what I had asked for before that the Court of Appeals didn't agree with. We've modified it, we backed up, we've abandoned the motions on the record that I told you we abandoned. And we are taking what we believe is a more appropriate approach to tackle the problem that we believe exists. And we believe that we're within the statutory limitations for obtaining the data.

Does that clarify, Judge?

THE COURT: It does, yes. Thank you. Just to keep it in order, Mr. Hughes, do you want to respond to that?

MR. HUGHES: Yes, Your Honor, I do.

THE COURT: Go ahead.

MR. HUGHES: Our response is simple, Your Honor. I'm not sure the authority that Mr. Brass is relying upon, but this does sound like the exact same thing that was tried before. Specifically Texas Government Code 62.0132 regards jury summons questionnaires, and it is specifically about exactly what Mr. Brass is seeking to obtain: Jury address information of summoned jurors. It specifically says that a jury summons includes a questionnaire. The

questionnaire requires, among other things, residence, address, mailing address.  And it further says that that is confidential.  That information has limited disclosure to the court personnel, litigants, or litigant's attorney in a cause of action in which the respondent to the questionnaire is a potential juror.  So based on that statute, I believe it applies to exactly what Mr. Brass is asking.  The jury address information is confidential.  This is not regarding the jury selection process that Mr. Brass referred to.  I believe that was the Code of Criminal Procedure 35.29, I believe.  Something like that.  That actually says, "Jury selection process."  This statute does not say that.  It talks specifically about information contained within the questionnaire part of the summons for jurors is confidential unless the cause of action is pending before that lawyer -- and here it's premature.  The trial hasn't been called as far as I know.  There's not a jury impaneled.  So we are relying our argument on that, that his motion for this information should be denied.

THE COURT:  What section were you quoting in the Government Code?  62 what?

MR. HUGHES:  62.0132, Your Honor.

THE COURT:  Okay.

MR. HUGHES: In addition, Your Honor, the county would like to submit and offer the evidence the Montgomery County electronic jury selection plan and give it to Mr. Brass just so the Court and everybody is aware of the policy the county has in summoning jurors.

THE COURT: Okay.

MR. HUGHES: May I approach and offer it at this time?

THE COURT: Yes.

MR. HUGHES: Any objection, Mr. Brass?

MR. BRASS: Judge, this has been going on for a year now. So today is the first day that's being offered to me? It's certainly not timely in the sense that I can absorb it in few short moments. And -- but, I mean, he can offer anything he wants. That's fine. But in terms of --

MR. HUGHES: This is what Mr. Brass wants. I'm trying to give it to him, Your Honor. It'S public record. He has opportunity to get it for himself.

MR. BRASS: What I want is address data, electronic address data, not what the county policy is. I'm very interested in knowing what the county policy is. But, again, I think it's a little untimely on the day of our hearing to present it.

THE COURT: All right. Distribute a copy to Mr. Brass and bring one to me. Mr. James, you want to make an opening?

MR. JAMES: Very briefly, Judge. Essentially we would object to having this hearing on the grounds of, one, that this issue is not yet ripe.

THE COURT: Well, I'm not going to listen to that. We're having the hearing. So what's next?

MR. JAMES: The defense is basically still attempting a fishing expedition on this, Judge. What Mr. Brass is asking for now is piece meal of what he asked for initially. He is asking for juror address data. I'm sure we'll be back here later on, on the things he asked for later already.

MR. BRASS: May I respond, Judge?

THE COURT: Well, it's opening. You don't need to respond. Let me review some things real quick. I'm -- Mr. Brass, I'm trying to get my head around what you're telling me is different. I'm just -- I'm not there. It seems like what you're asking for -- let me see if I can put it into words, and you can understand my difficulty. I understand you're not pulling the addresses off the questionnaire. That's not what you're asking to be done. Where are you asking -- where are these addresses? Where are they

going to come from?

MR. BRASS: Part of the reason that previously I had filed the motion to take a deposition, which they so vehemently opposed, was to discern in what form the information that I'm seeking lives. But I decided since they were so opposed to that, that in a hearing such as today we could pursue -- you, the Court, both sides, could discern that information from the witness stand and a deposition was not necessary. I believe that in a computer there is electronic data that is furnished to an outside vendor for the purpose of summoning jurors. So I believe the District Clerk's Office delivers to an outside vendor a list of names and addresses. And I believe that those people who understand computers better than I can extract from that data that already exists simply the list of addresses. My experts will testify --

THE COURT: So to kind of put this in terms of a judge's -- a layman's understanding, there is a body of data that contains the addresses of everybody that could potentially -- no?

MR. BRASS: Not potentially. Were summoned.

THE COURT: Who were summoned?

MR. BRASS: Who were summoned. Again, I

predict that the testimony from the clerks that were present will say that they may be able to shed some light on how that list comes into existence. I'm thinking it comes from driver's license and voter registration. Or I've heard that is where it comes from. But nevertheless at some point in time somebody mailed to a large number of citizens of Montgomery County a jury summons. And what I want to do is be able to take that address data -- my demographers will tell you that they can put it into a software program that will pinpoint all those addresses on a demographic chart and overlay that to the census data of where the black citizens live. And they will scientifically be able to tell this Court and the courts that review what happens here today and in the future whether those jury summons are being sent out in a racially neutral manner. We know -- and the six lawyers that I subpoenaed today anticipate to testify that there is a demonstrable and obvious disproportionate number of black Americans on our jury panels. The question is why. If our system is not racially neutral, then there is something wrong with it and it needs to be fixed. This defendant and all defendants have a right to know that. The only way that they can find that out is by having the keepers of this information give it to the

experts who can analyze it to make the determination as to whether our system is racially neutral. There may very well be a different explanation for why our juries are obviously unrepresentative of our population. It may be sociological reasons. And if so, then I would be the first to admit that Montgomery County's jury summoning system is not effective or legal. But if overlaying the data we find out that the summons are not going to the black part of our -- the part of our community where the black residents live, then we have a racially-bias jury summoning system. And according to the case law, that is illegal. The only way a defendant can find this out is if the keepers of the information share it with us in a careful confidential, delegate manner. I'm going to propose in our hearing that the expert demographers sign confidentiality agreements to protect this data and respect it, give it the due respect that it deserves, and conduct this analysis professionally, scientifically. But if this Court and the reviewing courts and these government attorneys preclude defendants from accessing the data that they have, then we can't answer the question as to why our juries are unrepresentative of our population racially. And I submit to you, as we all know, that a juror questionnaire comes from when a panel is seated

in a particular court and hands in this government code where we have these rules about only the judge of that particular court can give that information to an attorney, party, the media upon showing of good cause. It does not apply because that's not the data that I'm asking for. I'm -- the data that I'm asking for is before that happens. There is no court that these jurors belong to. This is the data that the county uses to summon the jurors. If we are summoning the appropriate number of black persons to jury duty, then my motion challenging the jury summoning process is without basis. But until we get data and do the analysis, we just don't know that. I respect the prosecutor's anticipating what I may do next, but I submit to you that that is an assumption without basis. They don't know what I'm going to do next. And I would commit to this Court that I'm not going to do anything that is not consistent with the authority that a defense attorney is bestowed in defending a defendant zealously.

THE COURT: Who is your first witness?

MR. BRASS: Sir?

THE COURT: Who is your first witness?

MR. BRASS: I call Lydia Clay-Jackson.

THE COURT: Already have everybody sworn

in?  How are we going to do this?

MR. BRASS:  My intention is six lawyers first, then the two clerks and then the experts.

THE COURT:  Everybody that's going to testify, raise your right hand.

(Witnesses present sworn)

THE COURT:  Mr. Brass, call your first witness.

MR. JAMES:  Judge, we ask that the Rule be invoked.

THE COURT:  The Rule is invoked.  For those of you that are non-lawyers, you cannot discuss the case.  You cannot discuss any testimony you may have about the case with any of the other witnesses.  You can't even do it with other witnesses if other lawyers are around.  You can, however, discuss the case and your testimony with the lawyers themselves.  So with that, I'm going to ask everyone to be excused, Mr. Brass, except for Ms. Clay-Jackson?

MR. BRASS:  Yes, sir and our experts, Judge.  They qualify for exclusion.

THE COURT:  They are excluded from the Rule.  So, Ms. Clay-Jackson, if you would come up and have a seat.

Whenever you are ready.

LYDIA CLAY-JACKSON, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record, please.

A. Lydia Clay-Jackson.

Q. And, Ms. Jackson, how are you employed?

A. Clay-Jackson.

Q. I'm sorry?

A. I'm a lawyer.

Q. How long have you been a lawyer?

A. Since 1985.

Q. Tell the Court where -- geographically where your primary practice is.

A. My primary practice is here in Montgomery County. I practice all throughout the state. It's about four blocks from here. And my entire career my home office has always been in Montgomery County.

Q. Do you hold any positions with bar associations or professional organizations of note?

A. I am former president of the Texas Criminal Defense Lawyers Association. I am chair elect of the State Bar Committee for Criminal Justice. I am former chair of Lone Star Legal Aid Society. I'm board certified in criminal law by the TDLS.

Q.   Ms. Clay-Jackson, do you have experience trying jury trials in Montgomery County?

A.   Yes, I do.

Q.   I know this is a difficult question, but could you just estimate how many jury trials -- criminal jury trials you've tried in Montgomery County?

A.   I have tried criminal jury trials in Montgomery County, both as a criminal defense lawyer and as a prosecutor.  I've tried probably in excess of 57 trials.

Q.   Okay.  We didn't talk about your experience other than as a defense attorney.  Tell us about having been a prosecutor.

A.   I was a prosecutor for 13 months in the County Attorney's office when it had jurisdiction over all misdemeanor cases in Montgomery County.

Q.   And you tried jury trials in your capacity as an Assistant County Attorney?

A.   I did.

Q.   In the trials that you've tried in Montgomery County, have you had occasion to observe the presence of Americans -- citizens of African-American decent on the jury panels?

A.   Infrequent, yes.

Q.   And you are a person of African-American

descent, correct?

A.   Yes.

Q.   And have you a noticed a pattern during your career of the numbers of citizens of African-American decent on the jury panels on the cases you have tried?

A.   If it can be described as a pattern --

Q.   Well, let me rephrase.  In your own words, describe your observation of the presence of citizens of African-American decent on our jury panels.

A.   With the trials that I have participated in, the number of black Americans on the jury panel probably have numbered about 15.

Q.   That's 15 out of?

A.   About 50 to 70 cases.

Q.   Have there been any panels where there were no citizens of African-American decent on the panel?

A.   Oh, yes.  Sorry.  Go ahead.

Q.   How would you characterize quantitatively the number of panels that you have observed no citizens of African-American decent?

A.   The vast majority.  More than 80 percent.

Q.   More than 80 percent of the trials that you've tried, the panels contained no citizens of African-American decent?

A.   That's correct.  That's since 1985.

Q. Go ahead.

A. The most African-Americans on any panel that I can recall -- since I received the subpoena I sort of thought about that -- was four out of --

Q. Out of a panel of how many?

A. That was a felony trial, so it was a panel of probably 52, something like that.

Q. Okay. If you -- I mean, just based on the math that you -- if you apply the math to the numbers you've already testified to -- well, let me withdraw that question. If you would assume that there is 4.3 percent of the population, adult population of Montgomery County consists of black Americans -- I've done a little chart with the math as a visual aid, not as evidence. If you use the percentage of 4.3 --

MR. JAMES: I'm sorry. I'm going -- I'm objecting. He says this isn't evidence, just a visual aid; yet, he's given it to the Court as if it is evidence. If it's evidence, there is no testimony to support these numbers.

MR. BRASS: I'm not offering it as evidence. I gave it to the Court so the Court can see it just as if I had published it on a overhead projector.

THE COURT: I think math is pretty much

common sense. So, I mean, it's just numbers on what -- is that what you've been given? Numbers?

MR. JAMES: Yes.

THE COURT: Okay. It's just numbers. Go ahead, Mr. Brass.

Q. (BY MR. BRASS) So you can see from this visual aid, Ms. Clay-Jackson, that on a panel of 60 if you apply the percentage and 70, 80, 90, 100, in your experience are these the types of numbers of potential jurors that are summoned by the courts for trials?

A. For felony trials. Are you asking me if 60 is a general number that we have for felony trials or 70 depending upon the type of trial?

Q. Correct.

A. Yes, generally.

Q. How many for misdemeanors?

A. Probably no more than 40.

Q. Okay.

A. Depending on what type of case it is.

Q. And, of course, this would be -- these numbers would be averages obviously. So if we start with a premises that there is an under representation of black Americans on our jury panels relative to our population and if you assume that 4.3 percent are of our adult populations is black, in your experience on an average

of all 60 person panels has there been an average of 2.58 people of African-American decent on the panel?

A.   Not in my experience.

Q.   Is the -- and obviously you can see the numbers increase as the number of potential jurors increases. In all categories of numbers of jurors on a panel has the indicated representative number fallen short on our panels?

A.   What's represented by this example?

Q.   Yes.

A.   The only -- I've tried two capital cases in Montgomery County where the 100 jurors would even come into play.  No, I didn't question four black Americans on that panel.

Q.   Out of those 200 jurors, were there any citizens of African-American decent?

A.   Not that I can recall, no.

MR. BRASS:  Pass the witness, Judge.

THE COURT:  Let's start with keeping it in order.  Let Mr. Hughes go first, and then when he is done it will go over to you, Mr. James.  Go ahead, Mr. Hughes.

MR. HUGHES:  No questions, Judge.

THE COURT:  Mr. James?

MR. JAMES:  May I proceed, Judge?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. JAMES:

    Q.   Ms. Clay-Jackson, a lot of the numbers that you told us you're doing this to the best of your memory, right?

    A.   That's true.

    Q.   You don't have any sort of statistics that you've kept over the years, anything like that?

    A.   Not that I've pulled up for this, no.

    Q.   In fact, you're having to sit there during your direct testimony and try to think back to the best of your knowledge about whether there may or may not have been a certain number of African-Americans on the panel?

    A.   That's correct.

    Q.   You're saying to the best of your knowledge you don't remember that there was or wasn't, you can't tell us one way or the other?

    A.   Well, on generally -- the general panels that we just talked about?

    Q.   I'm talking any specific panel, you can't tell us one way or the other, can you?

    A.   I probably could go back and look at my files. I could.

Q. Of course, you didn't do any of that before preparing to testify today?

A. Just cursory, sir.

Q. Of this 4.3 number that Mr. Brass gave to you, you, of course, have no idea about how many people from that percentage are eligible to serve on juries, right?

A. That's correct.

Q. So this 4.3 number may not be, in fact, the number of African-Americans are eligible to serve?

A. That's correct.

MR. JAMES: Pass the witness, Judge.

MR. BRASS: No further questions, Judge.

THE COURT: May she be excused?

MR. BRASS: As far a we're concerned, yes.

MR. JAMES: No objection from the State.

THE COURT: Thank you, Ms. Clay-Jackson. Next witness, Mr. Brass?

MR. BRASS: I call Tay Bond.

THE COURT: Tay Bond.

MR. DELMORE: Can I be excused to use the restroom?

THE COURT: Do we need to stop?

MR. DELMORE: No. Mr. James will be present.

THE COURT: Okay. Here is Mr. Bond in his blue jeans and tie.

THE WITNESS: And tie on, Judge. I have previously been sworn.

THE COURT: All right. Get comfortable. And then whenever you are ready, Mr. Brass.

MR. BRASS: Thank you, Your Honor.

E. TAY BOND,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record.

A. Tay Bond.

Q. Mr. Bond, how are you employed?

A. I'm employed by myself.

Q. And what do you do for a living?

A. I do criminal defense work.

Q. So you are an attorney?

A. Yes, I am.

Q. And how long have you been an attorney?

A. 1998.

Q. And in these years that you've been an attorney in what roles have you played in our criminal justice system?

A. I was in private practice initially. I have

been Assistant County Attorney, and I've been an Assistant District Attorney. And I've been partners in a firm; and I now run my own show.

Q. How many years were you a government lawyer?

A. Probably around two.

Q. Total?

A. Total.

Q. Okay. Have you held any note-worthy positions in bar associations or any other certifications that would impress us?

A. I don't know if it would impress you, Mr. Brass. But I have been the president of the Criminal Defense Bar here in Montgomery County. I've been the president of the Montgomery County Bar also.

Q. In your career -- oh, and the geographical location -- your primary geographical location of your practice, where is that?

A. It is primarily Montgomery County, Texas.

Q. Have you had occasion to try jury trials in Montgomery County, Texas?

A. Yes.

Q. On few or many occasions?

A. I would say many. I've tried probably -- since December I've done six jury trials which is probably more than any other criminal defense attorney or

prosecutor in this county.

Q. Six since December of 2013?

A. Of '13, yes.

Q. I know this is a very difficult question, but could you just estimate the number of jury trials you've tried in this county during your career both as a private lawyer and a government lawyer?

A. Conservatively I would say in excess of 50 easily.

Q. 50?

A. In excess of 50.

Q. In excess. Have you -- you understand that the issue for us today has to do with the representation on our jury panels of citizens of African-Americans decent?

A. Yes, sir.

Q. Have you had the opportunity to observe the presence of African-American citizens on the jury panels of the cases that you've tried?

A. I have from the Justice of the Peace level through the county court level, through felony court, absolutely, as a prosecutor and a defense attorney.

Q. In your own words, how would you characterize the presence of citizens of African-American decent on our jury panels in terms of numbers?

A.   I would best answer that by example of a case I tried recently in this court where I was representing an African-American male.  We had approximately 80 venire persons, and I believe there was one or none of African-American decent.  The only African-American in the courtroom period was my client.

Q.   Is that a typical scenario in your experience for the trials you have tried?

A.   I would say it is certainly common to have one or two even on a felony venire panel of African-American decent or none.

Q.   Can you estimate the percentage of jury panels in cases that you a have tried where there were none?

A.   I would have a hard time coming up with a percentage, but I can tell you that it would not be surprising at all based on my experience to have a full felony panel and they are not to be any African-Americans on it at all.  But percentage-wise I don't think I can give you that.

Q.   Okay.  If I were to tell you that the experts will later testify that 4.3 percent of our adult population of Montgomery County are citizens of African-American decent, there is a visual aid before you that just simply does the math in terms of panels of 60, 70, 80, 90, and 100 applying that percentage and

how many jurors it would take to be representative of that population.  Do you see that visual aid?

A.  Yes, I do see it.

Q.  So we would be talking or expressing that in terms of an average.  So if you had, say, two panels of 60 and -- so two times 2.58 is 5 thereabouts -- 5.16.  You can't have a .16 of a person.  But, say, 5, round it off, in your opinion in two panels of 60 on the average are there less than five citizens of African-American decent in your experience?

A.  Absolutely.  Absolutely.  I've never had -- I don't think I've ever had three African-Americans on a panel of 60 or 70.  Maybe once.  Maybe once.

Q.  In all of the trials you have tried?

A.  To my recollection, absolutely.  I don't think I've ever had three on a panel.

Q.  Have you been aware personally of an obvious absence or under representation of black Americans on our jury panels in this county?

A.  That would be my opinion, and it has certainly been the opinion of African-American clients that I've represented.

MR. BRASS:  I'll pass the witness, Judge.

THE COURT:  Mr. Hughes?

MR. HUGHES:  No, Your Honor.

MR. JAMES: May I proceed, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. JAMES:

Q. Mr. Bond, you don't know the -- you don't have any statistics for the number of cases you have tried and the number of African-Americans on every single one of those jury panels, do you?

A. No, sir.

Q. Okay. You're just going based off your best rough estimate at this point; is that fair to say?

A. That is correct.

Q. And the number -- this 4.3 number that Mr. Brass has given to you, you don't know where that number comes from obviously, right? He is asking you to assume what his experts will testify to later?

A. That is correct.

Q. And you have no idea whether that 4.3 percent of African-Americans include those that are registered to vote in this county, do you?

A. No, I do not.

Q. You don't know whether that number is less and how much less from the hypothetical 4.3 percent that the defense is talking about?

A. No.

Q.   Okay.  Mr. Bond, you testified that you picked a jury in this court with a panel of approximately 80 people?

A.   Well, I think we attempted to pick one where I was representing an African-American.  I was successful -- because there was a learned juris on the bench -- in having the panel stricken because it did not meet the constitutional standards for my client to have a jury of his peers.

Q.   So another panel was brought in at that point and y'all picked a jury from that panel?

A.   That is correct.

Q.   Are you aware a jury panel in this particular court from last late April, early May of 150 people that had six African-Americans on that panel?

A.   No.

Q.   Okay. And just by going off of Mr. --

A.   I don't think that was my case.  I don't think we had 100.

Q.   That's why I'm asking if you you're aware. Going off Mr. Brass's little math here, just doing the math there, 4.3 percent of 150 is 6.45.  So as you understand --

A.   I don't do math on the record.

Q.   Mr. Bond, I can write it out if need be.  You

understand you can't have part of a person, right?

A. I agree.

Q. So six African-Americans on a panel of 150 would be consistent with Mr. Brass's own numbers, right?

A. I know you're an officer of the court and you're not going to lie to me. If that's correct, then that's correct.

Q. All right.

A. I need a calculator.

MR. JAMES: I'll pass the witness, Judge.

REDIRECT EXAMINATION

BY MR. BRASS:

Q. Mr. Bond, you're not saying that there is never any black people on our panels; is that correct?

A. No, I'm definitely not saying that. I have seen several, but they are unique.

Q. Okay. So if it was a panel of 150 with six citizens of African-American decent, we're not saying that that never -- you're not saying that never happens, are you?

A. If I was picking a panel and the venire panel consisted of 150 persons with six of them being black, I would feel like I won the lottery in order to do my jury selection.

Q. Are you saying that because that's a rare occasion?

A. I think it would be extremely rare.

MR. BRASS: That's all, Judge.

THE COURT: Mr. Hughes?

MR. HUGHES: No, Your Honor.

THE COURT: Mr. James?

MR. JAMES: Nothing further for him, Judge.

THE COURT: May he be excused?

MR. BRASS: Yes, Your Honor.

MR. JAMES: No objection.

THE COURT: Thank you, Mr. Bond.

THE WITNESS: May I be released from the subpoena, Your Honor?

THE COURT: Yes. Go back to work. Next witness?

MR. BRASS: Jerald Crow, Judge.

THE COURT: Jerald crow. I prefer him to be called Colonel, so we'll stick with that. He's earned it.

THE WITNESS: Sit here, Your Honor?

THE COURT: Yes, sir. Thank you.

Whenever you are ready, Mr. Brass.

MR. BRASS: Thank you, Your Honor.

                         JERALD CROW,

having been first duly sworn, testified as follows:

                    DIRECT EXAMINATION

BY MR. BRASS:

    Q.   State your name for the record, please.

    A.   Jerald D. Crow.

    Q.   And, Mr. Crow, do you also hold the title of
Colonel?

    A.   I do.

    Q.   And we've been instructed by the Court to refer
to you as Colonel Crow.

    A.   Thank you, Your Honor.

    Q.   And so Colonel Crow, how are you employed?

    A.   I'm self-employed as a lawyer.

    Q.   How long have you been a lawyer?

    A.   Since May 12th of 1966.

    Q.   48 years?

    A.   47, 48 years, yes.

    Q.   Okay.  Where has been your primary geographical
area of practice?

    A.   Since 1977, it's been in Conroe, Texas.

    Q.   Have you held or do you hold any positions in
bar associations, professional organizations,
certifications that would impress us?

    A.   Well, I belong to numerous professional

organizations over the years. At the present, I'm -- I only belong to the Texas Bar and Montgomery County Bar Association, Montgomery County Criminal Defense Lawyers Association. I have been president of the Montgomery County Bar in the past as well as held numerous other positions, administration of the bar and business. I served as a military judge. I served as a municipal judge in Panorama Village, Texas for about a year, sir.

Q. You were in the marines?

A. Yes, 21 years.

Q. Since 1977, have you been trying jury cases in Montgomery County, Texas?

A. Yes, I have.

Q. And I know this is very difficult question, but could you estimate for us, the Court, and the other courts that will come in the future how many jury trials in this county you have tried?

A. That's probably not possible for me to give you an accurate estimate.

Q. Well, it's an estimate.

A. There are different kinds of jury trials. There are murder trials, capital murder trials, misdemeanors, and felony-level cases. I would say on the average, not counting the capital cases, I probably tried four a year would be my best estimate. And that

would be over 37 years.

Q.   And you said not counting the capital cases?

A.   That's correct.  Picking a jury on a capital case where the death penalty is involved is a much different proposition.

Q.   Okay.  How many capital cases have you a tried in your career in Montgomery County?

A.   From beginning to end for death probably 12 or 13.

Q.   Well, let me clarify that.  I'm concerned about your -- the focus of our inquiry is the observation of the make up of jury panels that you had an opportunity to observe in your career.  So even if a trial didn't go to verdict by jury, if you impaneled -- I'm trying to find out just ballpark estimate how many -- the magnitude of the numbers of jury panels you've had an opportunity to observe.

A.   There again, it's purely an estimate on my part.  As I said, personally trying cases as an attorney from picking the jury to the verdict I would estimate about four per year.  However, it is customary in our community for other attorneys to assist other attorneys in picking juries even though they are not a part of the jury process.  And to estimate that, maybe once a month.

Q. For all those years?

A. For all those years.

Q. Wow. So I did the math and four times 37 is 148 plus 12 capitals conservatively is 160. And then you're talking about another 12 per year that you assisted other lawyers?

A. That's correct. That's my best estimate.

Q. At the very most conservative approach to your estimating we're somewhere around the 250 trial level, does that sound right?

A. I accept your figure, sir.

Q. Okay. I want to tap into your memory and your -- of your observation of the racial make up of those literally hundreds of jury panels in Montgomery County, and particularly the numbers of citizens of African-American decent present on those jury panels.

A. I don't think I can give you an accurate number on that, but this might -- my memory tells me that most African-Americans I've seen on many jury panels in which I've participated, either as picking the jury or helping someone else, would be three or four. I want to clarify that a little bit because there was a time period in there, say, from '77 until Montgomery County took over, there was much less.

Q. Okay. Less than three or four?

A.   Yes.

Q.   As a maximum?

A.   As a maximum.

Q.   Right.  So let's dissect that a bit.  Were there many -- few or many jury panels that had no African-Americans on there -- in there membership?

A.   There were few.

Q.   Typically, as best as you can recall -- well let's just say this.  You said three or four at the most.  Is that a typical situation that there would be three or four?

A.   That is not typical, no.

Q.   Okay.

A.   That's the most I've seen on any panel that I have observed.

Q.   And out of the 250 some odd, how many times did you see that many citizens of African-American decent as best as you can recall?

A.   Few.  Maybe -- I can't really accurately answer that question, but only a few.  There may have been a dozen panels where I have seen that many African-Americans.

Q.   A dozen out of the hundreds?

A.   Yes.

Q.   Okay.  Have you had occasion to see panels

where there were none?

A. I have.

Q. Did I already ask that? No. Okay.

A. Yes, I have seen panels with no blacks.

Q. And is that a typical situation where there are none?

A. It is the usual situation, typical.

Q. The usual situation, typical?

A. In my opinion.

Q. Yes. I've asked the other lawyers, so I'm going to ask you. Do you see the visual aid that's in front of you with jury panel numbers and a percentage of 4.3 percent?

A. I see that.

Q. Okay. If you would assume with me that those who know much more about this than us will tell us in the future that there are 4.3 percent of the Montgomery County population that are Americans of African-American decent. Just simply applying the math to the numbers -- the various numbers of the sampling of the numbers of jury panels you see that on the average a panel of 60 would have two and a half people. So in other words, two panels of 60 would have five. Does that make sense?

A. Yes, sir, it makes sense.

Q.   Okay.  On average, a panel of a 100 would have four and a third, so two panels of 100 would have roughly 8 and a half statistically.  Can you see that?

A.   Yes, sir.

Q.   Okay.  So I want to ask you, in your experience has the presence of African-Americans on our jury panels fallen short of these numbers?

A.   Unequivocally short.

Q.   Unequivocally?

A.   Yes, sir.  In other words -- maybe I'm not answering the question.

Q.   It sounds like you did.

A.   Sir?

Q.   It sounds like you did.  But go ahead.

A.   We fall short, yes.

Q.   Gravely short?

A.   Unfairly short.

            MR. BRASS:  I'll pass the witness, Judge.

            THE COURT:  Mr. Hughes?

            MR. HUGHES:  No, Your Honor.

            MR. JAMES:  May I proceed, Judge?

            THE COURT:  Yes.

                  CROSS-EXAMINATION

BY MR. JAMES:

Q.   Colonel Crow, the 4.3 number that Mr. Brass has

given you, you don't know how many of that percentage of African-Americans that live in Montgomery County are registered voters, do you?

A.   I do not.

Q.   You don't know how many of those people have driver's licenses or on the driver's license list?

A.   I do not.

Q.   You don't know how -- are you aware of how jurors are summoned in this county?

A.   Generally familiar.

Q.   You understand it's the voter registration and driver's license list?

A.   Correct.

Q.   So you understand that this number could be significantly lower than the 4.3 Mr. Brass keeps bringing up, the number of potential folks who would be summoned for jury duty that are eligible jurors?

A.   I will confess I am not aware of the demographic make up of the citizens of our county as to how many are black, how many are white.

Q.   You're not aware of that make up?

A.   I'm not aware of the make up other than what I see on this piece of paper.

Q.   Of course, you can't tell us and you're just giving us your best estimate in regards to whether the

jury panels throughout your career have been showing a proportionate number of African-Americans on those panels to the population?

A. I have no way to measure that.

Q. You haven't kept track of any numbers?

A. No, I have not.

Q. You're just going based off on estimate at this point?

A. Experience, that's it.

MR. JAMES: Pass the witness.

REDIRECT EXAMINATION

BY MR. BRASS:

Q. Colonel Crow, if Mr. James is right and there is some slight adjustment that would need to be made for, in his opinion, the vast number of black Americans in our county who don't have driver's licenses and are not registered to vote, if there is some number. He characterized it as significant, but he doesn't know that. But if there does need to be some tweaking -- say, it's 4.1 percent of our population, from your experience and your observation of our jury panels, are the numbers of African-Americans on a jury panel still gravely short even of an adjusted number?

A. In my opinion, it is short if not gravely short.

MR. BRASS:  That's all, Judge.

THE COURT:  Mr. Hughes, anything?

MR. HUGHES:  No, Judge.

THE COURT:  Mr. James?

MR. JAMES:  No, sir.

THE COURT:  May Colonel Crow be excused?

Sounds like you're excused, Colonel.
Thank you.  Mr. Brass, next witness?

MR. BRASS:  Patty Maginnis, Your Honor.

THE COURT:  Colonel, would you mind
asking Ms. Maginnis to step in here when you get out
there?

THE WITNESS:  Yes, sir.

THE COURT:  I don't remember, were you
sworn in?

THE WITNESS:  No, sir.  May I bring my
drink?

THE COURT:  Sure.

PATRICIA MAGINNIS,
having been first duly sworn, testified as follows:

THE COURT:  All right.  Have a seat.
Whenever you are ready, Mr. Brass.

DIRECT EXAMINATION

BY MR. BRASS:

Q.   State your name, please.

A.   Patty Maginnis.

Q.   How are you employed?

A.   Currently self-employed at Maginnis, Pullan & Young.

Q.   What is your occupation?

A.   Criminal defense attorney.

Q.   How long have you been a lawyer?

A.   Since 1997.

Q.   Have you always been self-employed as a lawyer?

A.   No, sir.

Q.   What has been your work experience as a lawyer?

A.   I worked at the County Attorney's Office for Montgomery County back with Frank Brass as the elected official, then I worked at the District Attorney's office under Mike McDougal and Brett Ligon as a prosecutor.

Q.   When you started as a lawyer, did you start in the County Attorney's Office?

A.   Yes, sir.

Q.   And so for the first -- how many years of your career were you a government lawyer?

A.   14.

Q.   And you've been a lawyer a total of 17?

A.   Correct.

Q.   In those 17 years, what has been the primary

geographic area of your practice?

A. Montgomery County, Conroe area.

Q. Would you say exclusively Montgomery County?

A. No, sir. Harris County as well.

Q. All right. But is it primarily Montgomery County?

A. Yes, sir.

Q. Okay. Have you held any positions in bar associations, professional organizations, or do you possess other certifications that would impress us?

A. I don't know that they would impress you. I think they've probably been what you've already heard with other lawyers here; the Bar Association, Montgomery County Bar, and then I'm a member of the Montgomery County Criminal Bar and then the State Bar and then TCLA. I've done some extensive training and education as a municipal court judge for the duration of six years, and that's probably it.

Q. Okay. Have you had occasion in your 17 years to try jury trials in Montgomery County?

A. Yes, sir.

Q. On few or many occasions?

A. Many occasions.

Q. Now, this is a difficult question, and we all have difficulty answering this question. But I want

you to do the best you can to give the Court, the courts above us some idea of the number of jury trials that you've tried in Montgomery County in your 17 years as a lawyer?

A. Yes, sir. All level of offenses I'm assuming, correct?

Q. Yes. Let me clarify. All criminal trials.

A. Okay. If you take into consideration the generous amount of time spent at the JP level and then the county courts with misdemeanors and with felonies, I would say upwards 80 or so.

Q. Now, when you say "80 or so," are you talking about 80 to 150 or talking about 80 plus some?

A. I feel a conservative number would be 85 -- 85 trials conservatively.

Q. Okay. Fair enough. Have you had the opportunity during those 80 to 85 trials to observe the racial make up of the jury panels in Montgomery County?

A. Yes, sir.

Q. And particularly we're focused on jurors on jury panels who are of African-American decent.

A. Yes, sir.

Q. And do you have a belief, an opinion -- I don't know how we want to characterize it -- based on your observation of the numbers of people of

African-American decent present on the various jury panels?

A.   If I were to give you just an automatic answer if you asked me looking at a panel, for example, in a felony case where you had 60 or plus on the panel, I would say my recollection is possibly around two.

Q.   Now, when you say two, are you talking about two African-Americans on every panel?

A.   No, sir.

Q.   All right.  Have there been many -- few or many panels where there have been no citizens of African-American decent?

A.   Few or many?

Q.   On few or many occasions has there been no African-Americans?

A.   I would qualify that as many over that time period.

Q.   Correct.  And go a little bit out on a limb here.  Based on your experience and your knowledge and your interaction with the bar and your various capacities that you testified to, do you believe that there is a common belief in our judicial community regarding the absence of African-Americans on our jury panels?

A.   Do I believe there is a common belief?  When

you say "judicial community" are you the -- the legal community?

Q.  The lawyers, the courts.

MR. JAMES:  Judge, I'm going to object. Calls for speculation.

THE COURT:  Sustained.

Q.  (BY MR. BRASS)  There is a visual aid in front of you that has some mathematical --

A.  Uh-huh.

Q.  Examples.  And the number, 4.3 percent, that's utilized in those mathematicals, do you see that?

A.  Yes, sir.

Q.  So if you would assume with me that the demographic experts herein testified that the African-American population of Montgomery County is 4.3 percent, with the math applied to jury panels of various numbers from 60 to 100 -- and of course this would be an average.  So if we were looking to test whether the panels appropriately represent proportionally the African-American population on panels of 60 -- just according to the math, nothing else -- you need two and a half people of African-American decent to be representative.  So on two panels of 60, you would expect to see five.  On a panel of 100, you would expect to see four.  On two

panels of 100, you would expect to see perhaps nine. In your experience of observing the jury panels in Montgomery County, do we fall short of these representative numbers?

A. I would say in my experience on what I observe, yes.

Q. Okay. And let me --

MR. BRASS: Excuse me just a minute. I'll pass the witness, Judge.

THE COURT: Mr. Hughes?

MR. HUGHES: No, Your Honor.

THE COURT: Mr. James?

MR. JAMES: Yes, Judge. I'll try to be brief as usual.

CROSS-EXAMINATION

BY MR. JAMES:

Q. Ms. Maginnis, you haven't kept track of any sort of statistics of the number of jurors brought in on panels on the cases you have tried, the number of African-Americans on those panels, have you?

A. No, sir.

Q. Everything you are telling us today is basically an approximation, just a best guess at this point, right?

A. Based on my observing the panels and my

recollection.

Q. You can't tell us any specific panel had X number of people on it and Y number of African-Americans on it, can you?

A. No, sir.

Q. In fact, you don't know what percentage of African-Americans in this county are eligible to be jurors, do you?

A. No, sir.

MR. JAMES: Pass the witness.

MR. BRASS: Nothing further, Judge.

THE COURT: May she be excused?

MR. JAMES: No objection to that.

THE COURT: All right. Thank you, Ms. Maginnis. Next witness Mr. Brass?

MR. BRASS: I want to call Gilbert Garcia, but I don't know if he has arrived yet.

THE COURT: Okay. We're going to take a little break. Judge needs a break.

(Brief recess)

(Open court. Defendant and all parties present)

THE COURT: Okay. I think you were calling your next witness.

MR. BRASS: I'm going to call Brian Burns

because he is here and Gilbert is not.

THE COURT: Were you sworn in before?

MR. BRASS: He was not, Judge. He was here late.

BRIAN BURNS,

having been first duly sworn, testified as follows:

THE COURT: All right. Have a seat.

THE WITNESS: Thank you.

THE COURT: You said Mr. Garcia is not here? Do you want me to have him picked up?

THE BAILIFF: I would love to.

THE COURT: I saw the twinkle in your eye.

MR. JAMES: No objection.

MR. BRASS: In his defense, he was at a doctor's appointment in Houston. I think Rebecca told me or his office called and said he was getting here as quick as he could.

THE COURT: Okay.

MR. BRASS: So we will proceed with him or without him.

THE COURT: I understand. Okay.

MR. BRASS: I guess the short answer is, no, I don't want him arrested.

THE COURT: All right.

MR. BRASS: May I proceed, Judge?

THE COURT: Yes.

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record, please.

A. Yes, Brian Christopher Burns.

Q. Mr. Burns, how are you employed?

A. I'm a solo practitioner here in Montgomery County. And, I guess, primarily practice up here, but I do a lot of work in Houston. I live in Harris County, so I go down there quite a bit.

Q. Is your office here in Montgomery County?

A. Yes. It's at 318 North Main, caddy corner to the courthouse.

Q. Okay. How long have you been a lawyer?

A. Licensed May 5th, 2005, so almost ten years.

Q. And has -- since you've been licensed, has your office always been located in Montgomery County?

A. Yes, for several years even starting -- I want to say when I was 1-L I worked for Stephen Jackson, a local attorney. And I worked for him I want to say seven years, maybe more. And then 2008, I went out on my own. So I've always either worked with Stephen Jackson or on my own since I've been a lawyer.

Q. So you worked for Steve before you were a

lawyer and after you became a lawyer?

A. Yes.

Q. And you've been on your own for six years. So between working for Steve in both capacities and your own, you've actually been in our judicial system up here 13 years; is that correct?

A. That sounds about right.

Q. Do you currently or have you in the past held any positions in bar associations, professional organizations, or have any certifications that would impress us?

A. For I want to say two, maybe three years I was the secretary of the local defense bar. The Montgomery County Criminal Defense Lawyers Association, I'm the current president until July. I'm a member of the TCDLA, NACDL. That's about it.

Q. Okay. So you are the current president of the Criminal Bar in Montgomery County today?

A. I was voted to be the president. So, yes, against my will.

Q. In that capacity have you won awards for your achievement in that capacity?

A. Yes. In fact, I did win an award at our annual banquet now that you mentioned it.

Q. I'm going to go back and include the time that

you worked for Mr. Jackson up here before you were a lawyer and the time you worked for him as a lawyer and the time you've worked for yourself as a lawyer, those 13 years.  Let me start with the years that you worked for Mr. Jackson before you were a lawyer, did you assist him and his associates in conducting jury trials?

A.  Yes, many jury trials.  At the time I worked with a couple of other lawyers, Jeremy Dishongh, Adam Dietrich -- well, non lawyers who became lawyers -- Jeremy Dishongh, him and I went to school together, Adam Dietrich, also a criminal lawyer, Rachel Williams, all of us started there and became lawyers and prepared many trials, criminal trials, civil trials, family trials all working with Steve Jackson.

Q.  I want to tap into your experience in participating in jury trials in Montgomery County, the selection of juries perhaps.  But the opportunities that you've had to observe the racial make up of the jury panels in Montgomery County, are you focused on that?

A.  Yes.

Q.  And I know this is difficult.  It's been difficult -- it's difficult for all of us to estimate the number of those opportunities that we've had to

observe jury panels and the number of trials that we've participated in. But I want you to try and give us an estimate of the number of trials that you have participated in jury selection.

A. Okay. Yeah, I was trying to think of that earlier today. To the best of my recollection -- I don't have an exact number -- but I want to say sitting second chair with Steve Jackson, I would say 30 trials whether from when I had third-year bar card until after I was licensed. When I was able to practice law, I'd say about 30 trials with him. I sat second with Byron Hatchet, an attorney that used to practice here for a number of years, probably eight or nine trials. And I think I sat with John Choate and several other attorneys.

Q. Okay.

A. Since 2008, I've been on my own. I'd probably say ten trials.

Q. Now, you didn't say a number. You said nine with Byron, and then you mentioned Choate; but you didn't give us a number. I'm up to 49 so far.

A. I'd say 50 approximately to the best of my -- yeah.

Q. Just going off your testimony, at least 50?

A. I'd say 50 approximately.

Q. Okay. As you a sit here today, do you have a recollection, impression of the racial make up of those jury panels?

A. Yes. I think just for my observation it goes without saying predominantly Caucasian. I represented a lot of minorities, specifically Hispanic; and so I'd like to think I'm, you know, focused on that quite a bit.

Q. Let me direct your attention to people of African-American decent --

A. Okay.

Q. -- present on those jury panels. Do you have a perception of the types of numbers that you have had direct opportunity to observe on your 50 trials?

A. Yes, just very few. And I actually was thinking of a case that really stood out to me, a case that I sat second with Steve on. It was in the 359th. Just as an example, after we had busted a panel of about 80, Judge Hamilton had brought in I want to say 102 jurors. I remember it being two African-Americans. I mean, that's what I remember. It really stood out to me. I couldn't believe there were so few.

Q. So out of a total of 182 jurors, there were two people of African --

A. I don't remember how many were on the first

panel. The second panel there was 102 jurors. I can remember just two African-Americans.

Q. Do you remember if there were any on the first 80?

A. I can't remember.

Q. Over all, can you recall occasions where there were no citizens of African-American decent on the panel at all?

A. Yes, many times.

Q. When you -- I want you to try to quantify "many" either in a number or as a percentage. We know that -- we already know that you didn't keep records of it. But as a highly intelligent, established attorney, I want your respected opinion as to -- I want you to quantify the amount of jury panels that you had personal opportunity to observe where there were no African-American citizens.

MR. JAMES: Judge, I'm going to object to speculation. He just said he doesn't keep any records. He doesn't know. He is asking him to speculate, to guess right now.

THE COURT: Overruled.

A. As far as records, the years -- I would say at least, you know, when I was working with Steve and we were picking juries, he had his chart and I had my

chart.  I did keep records.  Of course, I don't have those records because they would stay with his office when I left.  I did keep records.  Putting a percentage on it, I mean, I would say it's in the single digits, four percent, five percent if I'm just throwing number out there.

Q.  Four percent of what?

A.  African-Americans or less.  And total, I mean --

Q.  No.  Listen to the question.  Approximately how many panels had no members of African-Americans on it?  How often do you see panels with no black people on the panel?

A.  I'd say many times.  Is it the majority?  I can't say.  But definitely very common.

Q.  Okay.  There is a visual aid there which applies a percentage of 4.3 percent.  And just assume with me that the demographers will testify that our black population is 4.3 percent of the total.  And then we mathematically applied that to 60, 70, 80, 90, and 100.  And this, of course, is an average.  So on an average, say, two 60-member panels in order to be representative according to this equation -- and the State will certainly argue that it's not valid -- but just for demonstrative purposes, according to these

numbers you'd have to have approximately five to be representative. In your experience in this county does our jury panels fall short of this representative amount?

A. Yes.

Q. If, in fact, it's representative.

A. I would say it falls short.

Q. Does it fall grossly short?

A. Grossly short? I would say in my experience it has always been short of that number.

Q. But by how much? Just a little bit? A lot?

A. By -- when you're talking such small numbers one can be a lot. I would say if it's short, it's short.

Q. Okay. As president of our bar association, are you aware of a -- not sure how to characterize it -- a belief, a reputation, if you will, that there is an under representation of black jurors in our jury panels in our county?

A. I would -- I mean, I guess someone who does a lot of criminal defense, I would agree with that, that there is a shortage. As far as, I guess, being a reputation, yes, I agree with that.

MR. BRASS: Pass the witness, Judge.

MR. HUGHES: No questions, Your Honor.

MR. JAMES: No questions, Judge.

MR. BRASS: May I just see if Gilbert has arrived, Judge? If not, we'll move on.

THE COURT: Sure. Thank you, Mr. Burns.

MR. BRASS: I'll call Ed Stokes, Judge, from the clerk's office.

THE COURT: Okay. You've already been sworn, correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. Have a seat. Whenever you are ready, Mr. Brass.

MR. BRASS: Thank you, Your Honor.

RAY EDWARD STOKES,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record, please.

A. Ray Edward Stokes.

Q. And you go by Ed Stokes; is that correct?

A. Yes.

Q. And how are you employed?

A. I'm employed as the supervisor for the jury system in the District Clerk's Office.

Q. Mr. Stokes, I'm going to be very brief and very direct. And we're going to ask you: Does there exist

electronic data that would inform an observer of that data of the addresses of the jurors summoned for jury duty in our county?

A. Yes.

Q. If this Court ordered the District Clerk to provide the defendant's demographers, his experts, an electronic data file of the jurors that were summoned for jury duty in the calendar year 2013, is that something you could prepare for them?

A. No.

Q. Who could do that?

A. I'm absolutely not positive. The IT department has access to such things. I don't know how they could get into it.

Q. Okay. But is it true that the jury summons that go out go out from an electronic file?

A. Yes.

Q. Of names and addresses?

A. Yes, that's true.

Q. Okay. And, I believe, from your first answer you believe that it is possible whether it's you or someone else or IT to compile that data on some medium such as a disk or disks or thumb drives or hard drives or some computer medium that would contain just that address data; is that correct?

A. Could be possible.

MR. BRASS: I'll pass the witness, Judge.

MR. HUGHES: No questions, Judge.

THE COURT: Okay. Mr. James?

CROSS-EXAMINATION

BY MR. JAMES:

Q. Mr. Stokes, is the data that have -- is that what's been provided by the Secretary of State's Office?

A. That's correct.

Q. Would y'all then have to isolate the -- all that data for the folks that were summoned in 2013?

A. At our level, I couldn't do it.

Q. Okay. All right. And then with further having to be done, then the address information would need to be extracted from that information as well to get what the defense is requesting, right?

A. Yes.

Q. You're saying you don't know whether it can be done or not?

A. Not at any level I can approach.

MR. JAMES: I'll pass the witness, Judge.

REDIRECT EXAMINATION

BY MR. BRASS:

Q. Do you know either exactly or approximately how

many jurors were summoned in 2013?

A. Not off the top of my head. We do about 2,000 a week.

Q. 2,000 a week, 52 weeks a year?

A. Give or take, yes.

Q. So approximately 100,000 per year?

A. Could be. I don't remember the number off the top of my head. That's a large number.

MR. BRASS: One moment, Your Honor?

THE COURT: Yes.

MR. BRASS: Pass the witness, Judge.

MR. HUGHES: No questions of this witness.

MR. JAMES: Judge, nothing further for Mr. Stokes.

THE COURT: Okay. May he be excused?

MR. BRASS: Yes, Judge.

MR. JAMES: No objection.

THE COURT: All right. Thank you, Mr. Stokes. Next witness Mr. Brass?

MR. BRASS: Judge, and I also got what I needed from Mr. Stokes. I don't need the other clerk, and I would submit that she could be released as well.

THE COURT: Okay. Any objection?

MR. HUGHES: Yes, Your Honor. I'll call

her.

THE COURT: You'll call her?

MR. HUGHES: Yes.

THE COURT: All right. Then we'll hold her until your turn comes up.

MR. BRASS: That's fine, Judge.

THE COURT: Any other witnesses?

MR. BRASS: Yes, Judge. I call Dr. Karl Eschbach.

MR. BRASS: I've given our court reporter his vitae so that she would have it.

THE COURT: Okay. I've got it. You were sworn earlier?

THE WITNESS: Yes, I was.

THE COURT: Okay. Have a seat. Whenever you are ready, Mr. Brass.

MR. BRASS: Thank you, Your Honor.

KARL ESCHBACH,
having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record, please.

A. Karl Eschbach.

Q. And how are you employed Dr. Eschbach?

A. I'm a professor and director of population

research in the Department of Internal Medicine at University of Texas Medical Branch in Galveston.

Q. Can you tell us a little bit about your education and background, training, and experience?

A. I have a Ph.D in Sociology from Harvard University, a post-doctoral fellowship at the Center for Demography at the University of Wisconsin. And then second post-doctoral fellowship at the Texas Medical Branch in Galveston.

Q. Okay. Tell us a little bit about your professional experience.

A. Okay. I have been -- since 1995 I've been a professor. I was a professor at the University of Houston, professor at the University of Texas Medical Branch, professor at the Department of Demography at University of Texas in San Antonio. I've taught demography, research methods, statistics in sociology departments and Department of Preventative Medicine and Community Health and the Department of Demography. I've also served as the state demographer of Texas which is an appointed office. I was appointed by Governor Perry on the nomination of the lieutenant governor and speaker of the house to advise government and government of Texas on demographic issues.

Q. And you served as the state demographer from

when to when?

A. From 2008 to 2010.

Q. All right. Have you published?

A. I have published, I believe -- I haven't checked lately. I think it's 57 peer review papers with over a thousand citations of scientific literature.

Q. Have you been involved in testifying in government activities in terms of redistricting?

A. Yes, I have testified. I think I want to say twice to the legislature on the topic of redistricting. I have testified many times in my official capacity as state demographer to the various committees of the legislature. I also in the last round did the districting plan for the city of Galveston. That plan was adopted.

Q. Okay.

MR. BRASS: Judge, I'm going to submit Dr. Eschbach as an expert. I've furnished the State with his 16-page CV. And I'll ask that if they will agree that he is an expert in the field of demography.

MR. HUGHES: No objection from the County, Judge.

THE COURT: Mr. James?

MR. JAMES: Judge, it's my understanding

that they don't need to ask the Court to do that anymore. But --

THE COURT: No.

MR. JAMES: But no objection.

THE COURT: Okay.

MR. BRASS: Thank you, Your Honor.

Q. (BY MR. BRASS) Dr. Eschbach, did I contact you approximately a year ago to enlist your assistance in this project that has brought us here to the Court today?

A. Yes, you did.

Q. Okay. And, in fact, is it true that you've been appointed by this Court as an expert for this defendant to participate in this endeavor?

A. That is my understanding.

Q. And have we met periodically over this past year and discussed the various issues as they've developed?

A. I believe we've had two face-to-face meetings and several phone conferences over that period.

Q. And multiple e-mails, other types of communication?

A. Yes, e-mails.

Q. Okay. And Max Beauregard is sitting here at counsel table with us. Could you tell the Court what

his role is in relation to you and your work?

A.   So Max has -- Mr. Beauregard has expertise in UCGLS information systems and demography.  I have known him for, I think, 20 years going back to the University of Texas.  He is particularly skilled at manipulating the data and the address files that might be received and making comparisons of those census distributions relative to the location of the African-American population in the county.

Q.   And so I have explained to you what our hypothesis is and what our issue is and that is we're challenging the jury summoning system in the county for being racially bias.  Is that your understanding of what we're doing?

A.   That is my understanding.

Q.   Now, as your expertise exists, is it applicable to the issue that I just stated?  Is this within your area of expertise?

A.   It is certainly within my area of expertise, yes.

Q.   And do you, in fact, have other experience dealing with racial issues in terms of components of population?

A.   Certainly my publication record, the vast majority of it is concerned with issues of racial

demography, racial counting, racial distribution, yes.

Q. Okay. Have you done at this point an analysis of the African-American population of Montgomery County?

A. Yes, I did. It is in the 2010 census which is the most recently available data for the county. I determined that the adult population of the county was 4.3 percent African-American. 14,250 African-American adults 18 years old or older in the county. And that is 4.31 percent of the population -- of the adult population of the county.

Q. Let me show you a visual aid that I prepared with your assistance. And does that include the numbers that you've just testified to?

A. Yes, the numbers I derived from the census.

Q. So as you've sat here this afternoon and listened to the lawyers testify about their observations of the jury panels in collectively vast experience, do you believe that there is at least a basis for the research to determine the cause or possible cause of the absence of African-Americans on our jury panels?

A. Certainly the majority of the testimony -- all of the testimony was consistent with the under representation of African-Americans on jury pools in

Montgomery County understanding that it was impressionist. Certainly I would have concluded there was good reason to fully investigate the issue further.

Q. You heard the representative of the District Clerk's Office testify that the electronic data of the addresses of summoned jurors is available. You've heard that?

A. Yes, I did hear the representative of the clerk's office say that.

Q. Given your -- you've heard him testify, did you not, that the names and addresses are transmitted to the -- on some type of electronic file, correct?

A. Yes.

Q. So with your experience with electronic files, do you believe it's possible, reasonable to extract just the address data from that broader amount of data?

A. It would certainly be possible to extract the address data.

Q. Does the software exist such that you could take that electronic data and perform an analysis in comparison to the census data to determine if the targets of the jury summons are racially neutral?

A. Yes. We could take the address data and geo-code it with the term used in relationship to census geography and geographic counts of racial

populations and do a statistical analysis of whether the jury summons as were reflected in the address list were consistent with the representation of African-American in residential neighbors in Montgomery County.

Q. If the Court orders the production of that data and the other courts that review this permit that to happen, do you agree to keep this data confidential and only use it for the purpose that you're commissioned to use it for?

A. I would certainly keep the data confidential. This is a routine obligation of my job working at a medical school to protect confidential HIPAA protective and other legal data. So I am certainly well equipped in terms of both the skills and the appropriate systems for data security to keep that promise.

Q. The visual aid that I -- so the 4.3 percent that we've used for the visual aid that we've asked all the lawyers about, that came from your examination of the census data, correct?

A. Yes. It comes from simple calculation of the 2010 census data for Montgomery County.

Q. Now, you've heard the prosecutor cross-examine the lawyers about -- that perhaps the actual number percentage would be less because of people who don't

have driver's licenses or are registered to vote as being eliminated from the data base. What is your response to that in terms of --

A. Well, it's certainly -- it is certainly possible that that would be the reason for just a discrepancy of the kind that we heard. I don't have any information as to the composition of driver's licenses or voter registrations or other sociological means that the people might be excluded. But my understanding of the purpose of the analysis would be simply to determine whether there was, in fact, a statistically equivalent representation or grossly under representation of African-American residential areas in the areas that we seek summons. So I could not speak to the issue but would think that the work that we would do with the data would help us to identify whether there was an issue that needed to be addressed.

Q. If, in fact, the exclusion of people without driver's license or voter registration manifested a racially biased system, the fact that they are excluded for that reason wouldn't effect the fact -- I mean, if they don't have a driver's license or register to vote, it doesn't mean they are not citizens; is that a fair assessment of the situation?

MR. JAMES: Judge, I just want to object. We've had a two-part question. I don't know what he would be answering at this point.

THE COURT: It's confusing to me at this point too.

MR. BRASS: All right. I'll separate it, Judge.

Q. (BY MR. BRASS) If an African-American citizen didn't have a driver's license, might they still be an African-American citizen?

MR. JAMES: Judge, I'll object. This witness isn't an expert on whether somebody is registered to vote or qualified to vote. He is asking him to speculate. He is also asking him a legal conclusion at this point.

THE COURT: Overruled.

A. Certainly persons without driver's licenses are citizens. I am certainly not an attorney and can't speak to the issue of eligibility.

Q. In your work in terms of, oh, say, making sure that districting is racially balanced, does the fact that a person does or doesn't have a driver's license effect the constitutionality of --

A. It's irrelevant. Sorry. Go ahead.

Q. Yes.

A. It is irrelevant to any position about redistricting, any questions of the population count.

Q. Okay. What about voter registration, does that -- is that relevant to racially-balanced issues?

A. Again, even voter redistricting is about voting, it is not relevant for determination of fair racial balance in districts.

Q. So in your analysis of whether a process passes constitutional muster, does either driver's licenses or voter registration become a factor?

A. I would not think it would be relevant.

Q. In terms of your -- listening to the testimony this afternoon from the lawyers about their observations in terms of the numbers -- and I tried my best to pin them down to numbers -- but the testimony be it as it may, does it depart statistically significantly enough from the numbers in our visual aid to warrant further investigation?

A. Yes, it does.

Q. And is that answer unequivocal, clearly -- I mean, how would you quantify it?

A. Again, I would have to say that each of the figures that was given by the people testifying was impressionistic, so it's not statistical data. However, if the numbers that they are characterizing

are correct, this would imply representation -- it's straightforward to calculate the percentage of jurors for a given size or potential jurors in a given pool based on the size of the pool as to what percentage should be African-American. So a jury pool of 60 if that is drawn in a random sample, about seven percent of such jury pools should have no African-American members and 48 percent should have three or more. At a 100 it's 1.2 percent of jury pools should have no African-American representatives, and over 80 percent it should have three or more just as a straightforward calculation applying 4.31 percentage and assuming random selection onto the jury pool.

Q. Just so that I'm sure the court reporter caught your answer clearly because you said it kind of quickly and not very loudly, can you repeat your characterization of the under representation? How did you characterize it?

A. Again, I entered characterization of gross under representation of African-Americans on jury pools.

Q. Gross under representation?

A. (Nodding head affirmatively).

Q. And are you testifying to that in your capacity as an expert demographer?

A. Yes.

Q. Was there a particular part of their testimony that was more significant to you in terms of your statistical perception, perhaps the percentage of panels that have no African-Americans?

A. So as I've already stated, the -- a jury pool of 60, no more than seven percent of jury pools should have no African-American representatives. The larger jury pools, that percentage would go substantially down. And I was hearing people were not -- obviously, according to numbers -- but they were using a word like "many," perhaps the majority; and the majority would be 50 percent compared to seven percent, six percent, five percent.

Q. That was what I was referring to.

MR. BRASS: I'll pass the witness, Judge.

CROSS-EXAMINATION

BY MR. HUGHES:

Q. Doctor, just so I can understand you clearly, if you were explaining the jury summons process in Montgomery County, couldn't you conclude hearing the summoning process that there is not a systematic exclusion of a particular group?

A. I could not conclude that without seeing the data about the pools that resulted. The statistical

calculations that I gave are very straightforward. So if those numbers were not produced, I would not know why. I would not infer intent or bias. I don't know anything about that on the basis of my expertise. It would be -- and issues of process would not get that question either. The question would be whether the representation of potential African-American jurors reflected the presence of the African-American population in Montgomery County.

Q. If the testimony that you learned the process of the way the county summons jurors is that it's random, then what significance difference does getting jury address mean?

A. Well, random -- that maybe a two-part question. It's random with respect to what list is one question, whether it's a list of eligible people to serve on the pools. That's something statistical analysis could help us solve. What the address list would help us do essentially is it is a demographic fact in this county as in much of the United States that African-Americans tend to live in very different areas compared to non African-Americans. So that by -- we could essentially -- by looking where the address summons were going, we could determine whether areas that have heavy concentrations of African-Americans were

statistically unrepresented in the summons that were sent.

Q. Are you aware of the requirements by law of how the Secretary of the State gives eligible jurors?

A. I am not.

Q. If you understood that the law requires that the Secretary of State takes voter registration, driver's license, IDs when they are compiling the potential jurors in the county -- take that as a fact -- and then that is generated as a program randomized, how would that go out to -- how would that represent an unfair population of minorities I guess is my question?

A. So what I could testify to is the comparison to the representation of adults in the population. Again, I do not have any information as to the representation of African-Americans in driver's license lists or voter registration lists. That data is not collected for either one of those processes, so I can't speak to that.

Q. Will address data rule out other possible explanations for under representation?

A. I'm not sure what you mean in terms of "other." It would not rule out any explanation of the cause. It would simply establish the fact or the nonfact of --

Q. Other things like the likelihood of African-Americans to respond to a summons or --

A. It would not speak to issues like that. It would not discriminate amongst different explanations of moving from the population to the jury pool. That would not be revealed by this analysis. The analysis would set the stage that there is potential under representations in the summons or not. It would not speak to cause.

Q. Is there any kind of marginal error that would -- that you think would be in your results?

A. Strictly speaking, no, in the sense that this is -- we're dealing with population data rather than statistics. Certainly, I would expect to apply the statistical tests for assuming a certain degree -- a certain degree of randomness in how the world works. But strictly we're analyzing population data here, not sample data. And the numbers are so large that the margin of error for any statistical calculation if you chose to address it in that way would be very small.

MR. HUGHES: Pass the witness.

MR. JAMES: May I proceed, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. JAMES:

Q. Doctor, twice when Mr. Brass was questioning you I heard you talk about the need for further investigation basically. Do you remember saying that?

A. Yes.

Q. And that's because you can't say one way or the other whether there is or isn't any sort of issue with the jury summoning process, can you?

A. You are correct.

Q. I mean, it's premature basically to say whether or not there is an issue with our jury summoning process and whether Mr. Davis has a jury panel that doesn't fit a fair cross section of the community, right?

MR. BRASS: Judge, I'll object because that's a misstatement of the issue. We're challenging the jury summoning process. It is premature to challenge the array in Mr. Davis' particular jury panel, and that's not what I'm doing. They think I'm doing that, but it's clearly not what I'm doing. And I hope that that's obvious to the Court. That's why that question --

THE COURT: I'm following what is going on, Mr. Brass.

MR. BRASS: -- is irrelevant, Judge.

THE COURT: Sustained.

Q. (BY MR. JAMES) Now, just to clarify, you don't know whether there is or there isn't an issue with under representation of African-Americans in the way that the county currently summons jurors, correct?

A. I believe I would say that.

Q. I just want to clarify for the record. You're saying that you don't know whether there is or there isn't an issue?

A. Well, I heard testimony from a number of attorneys that suggested figures suggesting a gross under representation on jury pools. I do not have any current information that would allow me to know anything about the process.

Q. So absent the anecdotal evidence of what you heard from people you can't say one way or another?

A. Without the data that is being asked for, no.

Q. And you don't know out of the 4.3 percent according to the 2010 census of the adult population of Montgomery County being African-Americans you can't tell us how many of that 4.3 percent are eligible to serve on juries, can you?

A. I don't have specific information. I have done some analysis of citizenship. African-Americans are over represented in the citizen population which would be expected to increase.

Q. Doctor, I'm sorry. My question is pretty simple. Can you tell us that information or not? Do you know the percentage of that 4.3 percent that are eligible to be on a jury?

A. I do not.

Q. And a lot of what the statistics that you talked about today in regards to redistricting, those are based off of straight population, right?

A. That's correct.

Q. They are not based off of eligible jurors, right?

A. That's correct.

Q. And you know that someone who is a convicted felon isn't going to be eligible to be a juror, right? Are you aware of that?

A. I'm aware of that.

Q. Someone who is a convicted thief isn't eligible to be a juror, right?

A. That's my understanding. I'm not an attorney.

Q. And someone who may be eligible to be a juror might fall into one of the several statutory exemptions that allows them from getting out of jury duty without having to show up, right?

MR. BRASS: Judge, that's way beyond his area of expertise. I'll object to that question.

THE COURT: Well, overruled to the extent he has knowledge because it plays into where we are going with this.

A. Could you, please, repeat the question?

Q. (BY MR. JAMES) Basically, I'll give you a little bit of the law, Doctor. There are certain exceptions or exemptions is the term that someone can -- falls into a certain category. Say if they are over 65, I believe is one of the exemptions that they can say, "I don't want to serve." And they don't have to. So they can get their summons in the mail and say, "You know what? I'm not going in or I'm going to contact and use my exemption." And then not be showing up. They may be the primary caregiver for a young child. That's another exemption. You can't tell us the percentage of people who may be eligible for one these exemptions out of these population, can you?

MR. BRASS: Judge, I object again because it's irrelevant. That does not exclude who is receiving the jury summons. We're asking for the address data of the jurors that are summoned. And the people that he's talking about would be included in, that not excluded. So --

THE COURT: I understand, but I think his question is still relevant with regard to the line of

inquiry we are in now.  So overruled.  Go ahead.

A.   I do not have information on that.

Q.   (BY MR. JAMES)  In fact, there is other reasons why somebody may not show up that may or may not be summoned to jury duty such as --

MR. BRASS:  Judge, I object to the characterization that they may not show up.  We are asking for the jurors who are summoned.  We're not talking about the ones -- he's on last year's set of motions.

THE COURT:  I understand, but he has a right to do this line of inquiry because of the witnesses expertise.  I think it's legitimate.  I understand the issues, Mr. Brass.  I'm not getting confused if that's what you're worried about.  But I think he has the right to ask these questionings.

MR. JAMES:  Judge, to be fair, part of the reason I'm asking this is because they have paraded several attorneys in here who testified to the under representations to people showing up in jury panels.

MR. BRASS:  Well, Judge, he should have asked them questions then, not my demographer.

THE COURT:  Let's move along.  Go ahead, Mr. James.  Next question.

Q.   (BY MR. JAMES)  So, Doctor, there is all sorts

of cultural and economic reasons why someone may not show up for jury service, right?

A. That's correct.

Q. Now, bottom line is you cannot say whether African-Americans are systematically excluded from jury panels in Montgomery County?

A. No, not on the basis of the evidence I have so far.

Q. And, Doctor, I understand that you've been appointed. How much have you been paid by the county for your work in this case so far?

A. So far, nothing. I believe I offered a statement of $2,500.

MR. JAMES: Pass the witness.

MR. BRASS: My turn, Judge?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MR. BRASS:

Q. Doctor Eschbach, isn't it the very data we're seeking that would answer the prosecutor's question as to whether there is or there isn't a racially neutral system in summoning jurors?

A. Yes, I believe what we would find from that exercise.

Q. If you already had the answer to that question,

we wouldn't need the data, would we?

A. Well, I would think not.

MR. BRASS: That's all, Judge.

THE COURT: May he be excused?

MR. JAMES: Fine with me, Judge.

THE COURT: Okay. Thank you very much, Doctor. Next witness, Mr. Brass?

MR. BRASS: I call Max Beauregard, Judge.

THE COURT: I know you were already sworn in, so just have a seat. Get comfortable. Whenever you are ready, Mr. Brass.

MAX BEAUREGARD,

having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record.

A. Max Beauregard.

Q. And how are you employed?

A. I'm a government professor at Houston Community College and I'm an independent demographics and mapping consultant.

Q. And do you have -- do you operate a company called Demographics and GIS Consulting Services?

A. Yes. It's a sole proprietorship.

Q. Okay. And tell us a little bit about your

education and background.

A. I have master's in science in city planning from the University of Texas in Austin and been involved with the census since 1980 and been a consultant since about 1995 -- no -- about 2005. Excuse me.

Q. How long have you been a professor? Did you tell me how long you have been a professor?

A. Five years. Six years, I guess.

Q. Have you been an evaluator of redistricting plans?

A. I've looked at redistricting plans and evaluated those for various -- to see what impact that had.

Q. Have you published papers?

A. Newspaper articles. Eschbach and I wrote a newspaper article in 2001 on suburbanization of minorities, and several other newspaper articles and trade publications.

Q. Does your work experience include work with HISD?

A. Yes. I was there for ten years as the manager of the demographics department doing enrollment forecasting for students. They have 200,000 students, so that was quite a task at the time.

Q. Are there similarities to that work and this project that you've been involved with us for this past year?

A. Very much so. We both -- both projects use geo-coding as Eschbach mentioned which is matching the address to the map; and once it's plotted on the map, then you can come in and do counts and tabulations with custom polygons and correlate that to census data. I've done that with school data and census data, particularly in forecasting school enrollment data. At the lower grades we're using census counts to forecast how many incoming Kinder and pre-K students are coming in.

Q. And does all that work involve the analysis of population data?

A. Yes, very much so.

Q. Do you possess -- oh, let's talk about professional organizations. Are you a founding member of the Texas Economic and Demographic Association?

A. Yes. We -- I founded this jointly with a local government agency. It's a professional association called Texas Economic and Demographic Association.

Q. And --

A. Did that about 1984.

Q. And you have been a board member for some

years?

A. Yes.

Q. Okay. This issue that -- did I contact you approximately a year ago to participate in this question about the jury panels of Montgomery County?

A. Right.

Q. And you -- were you appointed by this Court and authorized up to $5,000 compensation for your work?

A. Yes, that's my understanding.

Q. You have been paid anything yet?

A. No, nor signed a contract which I found interesting working for lawyers.

Q. In this field the only thing that's important is his.

A. Okay.

Q. Okay. So have you prepared for a hearing today a sample of the kinds of mapping and geo-coding that has been referred to in your testimony?

A. Yes. I went through the census and pulled out a black data by block. There are approximately 7,200 blocks in Montgomery County. And the racial and ethnic data, there is two -- approximately 250 categories which can be summed in any custom way. To define -- depending on how you define black, I chose non Hispanic blacks. There are blacks of one race, two race, some

other race, various ways of tabloiding biracial people. The census is very detailed in how it -- it surveys that. Since this data is user defined, you can be whatever you want to be, but it gives you lots of options in terms of how you define yourself. This is a very conservative count of non Hispanic blacks.

Q. Did you prepare these as visual aids to demonstrate manifestation of your skills as opposed the --

A. I don't know the process that we're going to use. Yes, the red and yellow map are actual counts of non-Hispanic blacks by block, and the other is the percent of blacks per block. You have to use both. Sometimes a little block can be 90 percent black, but it could only be four people because the actual number of people in that block is very low. So you have to use both those together. The third map on the 8 and a half by 11 is the sample of the geo-coding. The software address manages the address to the streets. And this is student data in Pearland Independent School District.

Q. In comparing your role to this work, to Dr. Eschbach's role, are you the one that's doing the leg work in terms of the data?

A. Yes. I was surprised to hear that it could be

100,000 summons. So that's pretty good chunk of data, but it's something the software can handle. A lot of time there is misspellings in the address or duplicate street names, that sometimes public data can be very inconsistent with what the street file is. And that's what you're doing is taking the individual address and matching it to the street file. And there can be inconsistencies there that it won't match, and then you have to go in and manually verify and correct the spelling or we see what the closest possible match is.

Q. Because you're actually doing the physical processing of the data -- and you own the software that does this; is that correct?

A. Yes. I have a software license I just upgraded in January.

Q. And you had to purchase that software, correct?

A. Yes.

Q. And the purpose of that software is for this demographic analysis?

A. Well, I use it for other projects to but, yes.

Q. Okay.

A. I did get the upgrade for this project.

Q. Is the reason that Judge allowed a 5,000 for you and 2,500 for Dr. Eschbach is because you're doing the hands on --

A.    I believe so, yes.  A lot of times correcting the addresses on 100,000 rejects can be -- it's a clerical task, but it can very time consuming.

Q.    Sure.  And this work that we're proposing that you do should the Court give us the data, order the clerk to give us the data, and the other courts agree with him, is this within your area of expertise?

A.    Very much so, yes, sir.

Q.    This is what you do?

A.    Right.  And, again, the value is once you have the dot on a map, then you can come in and count those and aggregate them by block or zip code or any other type needed.

Q.    Okay.  And in terms of confidentiality of this data, if the Court and courts deem that we are to get this data with which you do this analysis, do you pledge to keep this data confidential and treat it with --

A.    Certainly.  This is a standard procedure.  Like I said, school districts download their student data base as free lunch data and disability and sensitive data.  So it's standard procedure to sign a confidentiality.

Q.    And you're willing to do that?

A.    Certainly.

Q. And if you received the electronic data of the summoned jurors, are you able to apply it to the census data to see what the relationship is?

A. Yes, sir, by creating an overlay. Like you said, first plotting them on the map, and then overlaying them with the block data with actual counts there. And, again, I chose non-Hispanic blacks, but we can include other categories of blacks to, you know, these categories, like I said, to include biracial people. Mine does not include biracial.

Q. But, again, the purpose of these exhibits today are just demonstrative to show what you can do?

A. Right.

Q. These aren't the actual --

A. Well, they are an indication of the concentration. This gives us the first stab, and that's the process.

Q. But if we get the green light on this, will you and Dr. Eschbach work together to formulate the final approach to the processing of the data?

A. Yes. Yes, and we've worked together before.

Q. Sure. And once that's done, will you and Dr. Eschbach analyze the data together and formulate a report for this Court in terms of your findings of the analysis?

A. Yes, that's our purpose.

Q. You, your role in this, and Dr. Eschbach's role in this in terms of your relative areas of expertise, is it more his role to interpret the data in terms of the racial implications, reasons for the results of the data, whereas your role is more the mechanical part of it; is that accurate?

A. Yes.

Q. So questions like: "Could there been other reasons why there is a lack of representation on jury panels of black African-American citizens," is that within your area of expertise?

A. No.

MR. BRASS: Pass the witness, Judge.

MR. HUGHES: No questions.

THE COURT: Okay. Mr. James?

MR. JAMES: Judge, I don't have any questions for him.

THE COURT: Okay. May he be excused or step down?

MR. BRASS: Yes, Judge.

THE COURT: Okay. Thank you. Next witness, Mr. Brass?

MR. BRASS: Well, Gilbert finally made it, Judge.

THE COURT: Darn.

MR. BRASS: But I submit that his testimony would be accumulative of the other witnesses. But he did take the trouble to come.

MR. JAMES: I'll gladly cross-examine him.

MR. BRASS: So perhaps I better put him on, Judge.

THE COURT: Whatever you think is best.

MR. BRASS: Gilbert Garcia.

THE COURT: Let me get you sworn in before you sit down.

GILBERT GARCIA,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BRASS:

Q. State your name for the record.

A. Gilbert Garcia.

Q. How are you employed, sir?

A. Self-employed.

Q. And in what occupation?

A. Criminal defense lawyer.

Q. How long have you been a lawyer?

A. Since 1978.

Q. And have you always been a criminal defense

lawyer since 1978?

A. I've always practiced criminal defense law, but probably exclusively since the late '90s.

Q. You have ever been -- worked for any of the prosecuting entities?

A. I was a assistant county attorney when I first came here in '82. And then I was the head of the civil section of the County Attorney's Office probably for, like, a year; then I went out into private practice.

Q. Was that in 1983?

A. Possibly, yeah.

Q. Okay.

A. As best I can recall.

Q. Now, prior to 1983, were you involved in any jury trials in Montgomery County?

A. No.

Q. So is it safe to say that your experience with jury trials in Montgomery County has been over these past 31 years?

A. Yes.

Q. Have you held or do you hold any positions in bar associations, certifications, or other accomplishments that would impress us?

A. I was president of the Montgomery County Bar for two years. I'm thinking it was like '99 and 2000,

president of the Montgomery County Criminal Defense Lawyers Association maybe like a year after that in the early 2000s or the late 1990s, and board certified.

Q. Board certified in criminal law?

A. Yes, sir.

Q. Have you tried many jury trials in these 31 years in Montgomery County?

A. Yes.

Q. Oh, and in these 31 years, has your geographical center of your practice been in Montgomery County?

A. Yes. I do have other counties that I practice in, but I would say over 80 percent, maybe even 90 percent is here.

Q. Okay. And have you tried jury trials in Montgomery County?

A. Yes.

Q. And I know this is a difficult question, it's been difficult for everybody. But to the best of your recollection and your -- and as an estimate, how many jury trials have you tried in Montgomery County roughly and as an estimate?

A. I tried to put that together once, but it's very difficult when you're talking about such a large span of time. Earlier there were more, and it's

tapered off as life has gone on.

Q. You understand there are lawyers who never try jury trials?

A. Yes.

Q. And there are lawyers that try them every week. All I want is to put into the record where you fit in this spectrum.

A. In the last five years I've only tried three. But before that, I tried a lot. So it's just --

Q. You have to put us -- a lot?

A. Okay. When I first got into private practice, obviously, when you're doing court-appointed work you do more just because that's the nature of the beast. I would probably say the height of my practice might have been five a year, and then tapered down from that.

Q. You think you have a hundred trials under your belt?

A. Oh, yeah.

Q. 100 plus?

A. Oh, yeah.

Q. Good enough. In these 100 plus trials, have you had an opportunity to observe the racial make up of the jury panels in Montgomery County?

A. Yes.

Q. And particularly focusing on the numbers of

people of African-American decent on those jury panels, do you have a perception of your experience as to the level of numbers of African-Americans that have been on your jury panels?

A. Right. It appears low to me. All minority representation has appeared low. Obviously when a person's last name is Garcia, you're looking for minority representation more than most. And I've always thought it was willfully inadequate.

Q. And so -- okay. Have there been panels in your jury trials that were totally void of any African-Americans?

A. Yes.

Q. And how would you characterize the number -- quantify the number of panels that had no African-Americans? First, I'll ask you few or many?

A. Many.

Q. And within the category of many, can you quantify at all in terms of percentage, numbers? Just give us some definition of your interpretation of "many."

A. I would say almost a half had none that I can recall.

Q. Would you agree with me that half is more than seven percent?

A.   Yes.

Q.   I want to show you a visual aid that is among the various visual aids.  And you see that there is mathematical calculations that include the number 4.3 percent?

A.   Right.

Q.   And so I don't know how long you were sitting in the courtroom, but if you heard Dr. Eschbach's testimony that there were 4.3 percent of the adult population of Montgomery County are African-American, we've just done some calculations and the various -- as to various sizes of jury panels -- not all of them. Obviously, misdemeanors are smaller than 60.  But just 60 to 100, can you see the calculations of if there was a population representation on panels of 4.3 percent, those would be the numbers.  You see that?

A.   Got it.  Okay.

Q.   So in your experience I want to ask you if on the average have you observed less than what's indicated according to the percentage of the black population of Montgomery County?  For instance, 60 -- if you had two panels of 60, you would expect to see five people perhaps.  In your experience has there been less than that?

A.   Yes, less.

Q. And to quantify the degree of less, how would you quantify it? Grossly less? Moderately less? Mildly less?

A. Grossly less.

Q. And so for, you know, say, two panels of 100, you would expect to see eight and a half on the average. Again, would your estimation based on your observations, your experience, 31 years of trying 100 plus cases be less, the same, more?

A. I would say less.

Q. And would you apply the same quantification, grossly less?

A. Yes.

MR. BRASS: I'll pass the witness, Judge.

MR. HUGHES: Nothing for Mr. Garcia, Judge.

MR. JAMES: I'll be brief, Judge.

THE COURT: All right.

CROSS-EXAMINATION

BY MR. JAMES:

Q. Mr. Garcia, you don't have any concrete numbers of how many people on how many jury panels were of minorities or anything like that that you can tell us today, can you?

A. Concrete numbers wise, I probably have more

from the people that were standing in line to come in on jury duty on Monday mornings.

Q. So --

A. Because my office is right across the street.

Q. So you can't tell us on the 100 plus jury trials you said you've had how many of those -- what percentage of African-Americans were and weren't on those panels?

A. No, I couldn't tell you that. That's correct.

Q. You're basically going off your best memory and estimation at this point; is that correct?

A. That would be a good way.

Q. I agree with you about that. In fact, you don't know how many -- what percentage of the African-American population in Montgomery County is even eligible for jury service, do you?

A. No. I was just told it's 4.3 percent, but I don't have any independent knowledge.

MR. JAMES: I'll pass the witness, Judge.

MR. BRASS: Nothing further, Judge.

THE COURT: All right. Thank you, Mr. Garcia.

THE WITNESS: Be excused?

THE COURT: Yes, sir.

THE WITNESS: Thank you, Your Honor.

THE COURT: Next witness, Mr. Brass?

MR. BRASS: That's all we have, Judge.

THE COURT: All right. Witnesses, Mr. Hughes?

MR. JAMES: Briefly --

THE COURT: Yeah, sure. Sure.

MR. HUGHES: Your Honor, the county has decided not to call a witness.

THE COURT: Okay.

MR. JAMES: We don't have any witnesses.

THE COURT: All right. All parties rest. I think I've got the issues pretty good in my head. I don't need argument, but I have some questions for both sides. And it seems like the preliminary issue -- well, it's two-fold. The first one is you're not asking for the questionnaires. So my question to the County Attorney's Office and the State is under what theory would this be protected?

MR. HUGHES: Well, Your Honor, I'm going back to government Code 62 --

THE COURT: Well, that's questionnaires.

MR. HUGHES: It says in Section F that information contained in the completed questionnaire is confidential.

THE COURT: Right. But we're not

talking --

MR. HUGHES: And what Mr. Brass is requesting is the jury address data from the summons.

THE COURT: No, he is not. He is not asking for the questionnaires. He is not asking for the data from the questionnaires. He is asking for that data base of potentially summonable jurors is what I get. Am I right, Mr. Brass?

MR. BRASS: Yes, sir. If I might present a proposed order that I might think --

THE COURT: Okay. So before we go off on a tangent, what theory -- and I don't care who answers first or whatever -- what theory is this protected under if you believe it to be protected information?

MR. HUGHES: Your Honor, I'm referring to Mr. Brass's motion to produce juror address data, number four. I do not understand. What he writes there is he wants to compare the U.S. census data to the summoned juror address data.

THE COURT: Uh-huh.

MR. HUGHES: And you're asking what protection I'm relying upon? That's 62.0132 again because that's talking about juror summons. And it says, "Every juror summons includes a questionnaire." That contains that information and that is confidential

until he, Mr. Davis, has his trial with his jury present and it be given to the attorney in that case and on that matter. That's stuff he can get is my argument.

THE COURT: Okay. State, do you agree with that?

MR. JAMES: Yes, Judge. Article 35.29, when we're talking about the -- he's trying to limit it to say he just wants the juror summoning information. But it all goes back to this is personal information of jurors that is --

THE COURT: But the mandamus was very clear when asking for questionnaires, and they limited it to the questionnaires only. They said Mr. Brass has no right to get that information. They never said anything about what he is requesting now.

MR. JAMES: Judge, I don't believe Article 35.29 is limited to questionnaires though. It says, "Collected by the Court or the prosecuting attorney during jury selection."

THE COURT: But nothing has been collected. That's my point. That refers to the questionnaires. This is data that's maintained or produced, promulgated by the secretary of State's Office and kept wherever Mr. Sloan -- was that his

name?  Stokes -- wherever Mr. Stokes said it's kept. This is not collected as part of that process under 35.29.  That's what I'm understanding.  Am I wrong?

MR. JAMES:  Judge, I believe all this information falls under the jury selection process because they are gathering all of this to then send out to jurors for jury selection so they can come here and take part in jury selection.

MR. BRASS:  Can I give you some law, Judge?

MR. JAMES:  I would like to hear from Mr. Brass also.  He referred to case law earlier in the vague aspect of it.  I'd like to know what case law he is relying on so I can appropriately respond to that.

MR. BRASS:  Fortunately for me, Judge, they furnished it in their response.  I can quote it.

THE COURT:  Yeah, I mean, what case are you talking about?

MR. BRASS:  Okay.  In Lacy versus State, in their State's response to Defendant's motion challenging the jury summoning process filed February 26th of 2014, they say -- the State says, "Further, when a defendant challenges an array on grounds of systematic exclusion of African-American citizens, it is incumbent upon him to show some manner whereby

African-Americans were not included in the computer base from which the panel was selected." Lacy versus State, 899 Southwest Second, 284. This is their response to my motion. They're citing a case that is directly on point. If I can't get the data -- the electronic data, how can I meet the burden of showing --

THE COURT: We're not there yet. I got a different issue for that question. The issue right now is under what theory is the information you were requesting protected? And so far I've heard the same arguments that I heard last year that the appellate court said were valid arguments, but now you have changed your requests. So I'm not hearing that this is protected yet. Okay. Let's move on to my second issue. And you hit the nail on the head. Lacy says you, Mr. Brass, have to show some manner where they're included in the computer data base. It's not enough to just say, we think, we hope, we're not sure. Here's a problem I see. Under the doctrine of chances your experts have clearly shown it can't happen the way it happens. We don't know why but it violates the doctrine of chances. It's not just purely by random method that this is happening or purely -- I shouldn't say random method. Something is happening. We don't

know what it is.

MR. BRASS: Correct.

THE COURT: So --

MR. BRASS: Here's the standard that I think Hernandez sets out. The Rule of Exclusion, proof that blacks constitute a substantial segment of the population of the jurisdiction. I think I've met that burden. My expert has testified that 4.3 percent of the adult population of Montgomery County is African-American, that some blacks are qualified to serve as jurors. I think we all stipulate that that's correct based on what I've heard from the State. Now, in one of the cases they -- there have been -- there was evidence that there were none called for jury service over an extended period of time. What I believe that I've demonstrated through my six lawyers with unbelievable amounts of experience and numbers of trials, I believe I've made a prima facie that there is an under representation of African-Americans on our jury panels. I think that anybody who disagrees with that is comparable to the ostrich with its head in the sand. It is so patently obvious. But the difference between last year and this year, it's not just me saying that. It's in the record. The record is clear that there is something going on. It may not be a

violation of the Constitution. I submit --

THE COURT: That's the problem I'm having.

MR. BRASS: But, Judge, if you don't give us the data, I can't find that out. And a defendant has the right to find that out.

THE COURT: I understand your argument.

MR. BRASS: They should be the first ones upping this data to find out if they have a six-system or not. They are charged with the responsibility --

THE COURT: Hang on.

MR. BRASS: -- Of seeking justice.

THE COURT: I understand. The problem is the way the law is written. It's almost a catch-22. You can't get there until you prove that there is a problem, but you can't prove there is a problem until you get there.

MR. BRASS: Except that we're no longer asking for the prohibited items. We're asking for electronic -- and I'm making a distinction between electronic data and confidential juror information. When it exists -- and they are saying, well, it's included in the jury questionnaire. Well, you know, my address is in the white pages, the yellow pages, the voter registration. It might be in publicdata.com. It

may be in a lot of different places. The fact that it's in one particular place that's protected doesn't mean that you can't get at it in all the other sources that exist in the universe. It doesn't mean that and the law doesn't say that. So -- okay. They don't want to give the juror information from the questionnaire. Fine. I'm not asking for it. But it just so happens that this data exists somewhere else where it's not protected by statute. And under the cases that deal with the guarantee of a defendant of a racially neutral jury summoning system, it is hard for me to imagine that this Court and the reviewing courts will deny this defendant the right to find out if he's being denied a racially neutral jury summoning system. And if the Court of Appeals in Beaumont doesn't agree and the Court of Criminal Appeals in Austin, I believe a federal judge in downtown Houston will agree. And ultimately if you sign that order, we will get the data and we will keep fighting until we do.

THE COURT: All right. I've got everybody's motions, arguments of counsel on the record. Did you want to make a response?

MR. JAMES: Judge, yeah, I was just waiting.

THE COURT: I'm sorry. Go ahead.

MR. JAMES: Mr. Hughes wanted to make a response. Or I'll go ahead now.

MR. HUGHES: Go ahead.

MR. JAMES: Judge, just in response to a few things that Mr. Brass angrily stated. There's been no evidence that they've put forth about the percentage of the eligible African-American jurors. They told us the population. Their assertion that there is an under representation isn't based off correct data at this point. I understand you overruled my objection earlier, Judge, but it's our position that this challenge is still premature because the jury array has not been seated yet. I understand Mr. Brass is talking about the summoning process. But it all ultimately comes down to the jury panel that is brought in Mr. Davis's case. You know, the Court of Appeals held that these challenges were premature. They weren't ripe yet. The defense is speculating and essentially fishing. Under Article 35.29, we believe this information is protected. And additionally, Mr. Brass has gone on and on about case law and this and that. I just don't understand what authority he is relying on to where the Court can order the District Clerk's Office, a non-party to this case, to expend county resources to isolate transferred data and do all that.

I don't know what he is relying on to say this can be done.

So those are our various --

THE COURT: Well, I don't think you were here last year when we dealt with those issues. Well, I mean, you were here. I don't remember if you were arguing for the State.

MR. JAMES: I wasn't involved with the case.

THE COURT: It was more of a due process argument by Mr. Brass. And the State at that point tried to argue that it was over burdensome for the IT folks to come in here and basically write a five-word line code to pull this information out. And I didn't find that to be persuasive at all. So that argument's kind of moot at this point.

MR. JAMES: Judge, that's everything that I've got. I don't know if Mr. Hughes has anything to add.

THE COURT: Yeah. You're welcome -- I didn't mean to cut you off. But, Mr. Hughes, if you've got something you want me to hear, let me hear it.

MR. HUGHES: Judge, I think the Court's made up its mind.

THE COURT: No, I really haven't. I want

to go look at the law and read cases.

MR. HUGHES: Okay. What I'm trying to explain as far as the government code goes -- I wasn't here at the prior hearing either. But regardless of whether it's electronic data that he is requesting, I think it's clear that the legislature is trying to protect and deem confidential juror address information. And it's clear what these two statutes are talking about. So whether you're getting it through electronic data, I think my argument is still it's protected. It's intended to be protected because it's the same information as juror address -- summoned juror address information. So whether you get it off of a questionnaire or data base, I think it's still confidentiality.

THE COURT: Let me ask you this. Think of it like this. My doctor has my address because he does. That's protected health care information. That's my personal PHI. I can't remember what that stands -- protected health care information. My address is also listed with the secretary of -- or the Comptroller's Office. And that is freely discoverable unfortunately when I filed my financial statements for the year as I'm required to by the Texas Ethics Commission. Anybody can have access to those financial

statements. Just because my address is protected under HIPAA from my doctor doesn't mean it's protected under the Comptroller's Office by public information act request. So it seems -- when you're arguing it seems to dove tail together, but that's only I think a disingenuous way of thinking about it. It's really completely separate. I don't think the statute contemplates anything other than the questionnaires and the data to be pulled off the questionnaires. So, I guess, are you saying that it is the same? In other words, whether my protected health care information is where the source is from or from a Comptroller's Office is still the same information and because it's protected by HIPAA over here, it's still going to be protected by the Comptroller's Office over here. Is that what you're suggesting?

MR. HUGHES: Well, I think the intent is the juror -- because they're jurors. Sure, you can go get the jurors' address from DPS, elections, voter registration. You can get that information through other means. But at that point they are not the jurors. It's protecting the juror information. It's protecting the source of the funds and the District Clerk. And, again, I don't think -- the District Clerk does not have the means to get this information.

THE COURT: Well, they do.

MR. HUGHES: I think that's what Mr. Stokes said.

THE COURT: Yeah, they do. We had that last year. I think it was IT request, and it's a line of code basically that they have to pull it out. Whether or not Mr. Stokes can do it, I have no idea. I think he said he can't. But our IT department has access to it. They did do it very easily.

MR. BRASS: He testified it's available.

THE COURT: Yeah. I'm not saying that. I'm just saying the IT department would be the one doing it. Not the clerks. I'm agreeing with Mr. Hughes on that.

MR. HUGHES: Our protective order is for the District Clerk.

THE COURT: You just don't want them to be boxed in a position, be ordered to do something they can't physically do.

MR. HUGHES: Yes, sir.

THE COURT: I understand.

MR. DELMORE: Judge, I was present during that hearing last year. I don't think there was any testimony regarding how the IT department would do it. No one called anyone from that department as a witness.

I think you speculated that it would merely require writing a few lines of code. But I don't think that that's accurate, and there's certainly no evidence to support that.

THE COURT: Well, I'm not speculating. I'm dealing with other situations where the State has made that argument of this over burdensome, technically impossible thing to do, and the IT department comes in and writes a line of code for me and pulls the information out. So if the data is there, it's not hard for them to do. It's very easy. It literally is one line of code, and they can pull the data out.

MR. BRASS: If you want to tweak the order, Judge, to include the IT department --

THE COURT: Oh, I'm sorry. I didn't. Well, I'm not going to make a ruling yet because I want to look over the cases. I want to refresh my memory, go back over the mandate -- excuse me -- the mandamus from the Court of Appeals. I should have done that before we had this today. I just haven't had a chance unfortunately. So let me do that. Today is Wednesday. I'll get everybody --

MR. BRASS: I'm sure the County Attorney represents the IT department as well, Judge.

THE COURT: Well, yeah, of course. They

represent everybody in the county. Let me get a decision to you guys by Friday at 5:00. I've got a bunch of deadlines on Friday. I'll just dove tail this one into the rest of them.

MR. BRASS: On your time. Can I bring up a housekeeping issue, Judge?

THE COURT: Sure.

MR. BRASS: I would like for these visual aids to somehow be included in the appellate record. We know that it's going up. And it's not evidence. I didn't offer it as evidence. I'm not offering it now as evidence. But I think for the reviewing courts that are going to be looking at this, perhaps it would be helpful for them to be looking at same things that we were looking at just for demonstrative purposes. If we make the record clear that it's not being offered as evidence, but only for demonstrative purposes, summary of testimony. We do that all the time on civil side. We offer financial information statements as a summary of what the witnesses will testify. It's not evidence. And if somehow we could -- there aren't any other exhibits to differentiate. And if we could attach them as simply visual aids, demonstrative purposes, my feeling is it would be helpful to the reviewing court.

MR. JAMES: Judge, I'm going to object to

anything that Mr. Brass has said wasn't evidence that he just wanted to show as a visual aid, which was everything he handed the Court. I didn't object earlier because it was never offered as evidence. These documents as visual representations here have been covered in the testimony. Additionally, they are not -- they are just -- these don't represent the juror information by any means. They just represent potential population. I think it would be confusing for the Court. If I remember correctly, the only evidence that was offered, other than testimony, was by Mr. Hughes in regards to the Montgomery County electronic selection plan.

MR. BRASS: That was not offered as evidence. I would certainly object to that. If they want to offer it now, I'll object to it as hearsay.

MR. JAMES: Mr. Hughes offered it at the start of the hearing, Mr. Brass.

THE COURT: Well, I took it up, the same as I took Mr. Brass's information which is why I took Mr. Brass's information. But I don't think it's been offered or admitted.

MR. HUGHES: I'd like to reopen it at this time and offer it, Judge.

THE COURT: I have a solution to all this

which is attach, seal it, make it part of the record for appellate purposes only. Do not attach it as evidence. And I'll be honest with you, Rick, I looked at the maps. I don't understand them. I mean, I'm sorry. I know they're meaningful to the experts, but this is -- you're talking statistics here. I am an algebra expert and that's about it. So --

MR. BRASS: I agree, Judge. That's why we have them. But I would agree to what you're proposing to even include the County Attorney's visual aid as long as it's not evidence.

MR. JAMES: Judge, what Mr. Hughes offered is a record of this Court, basically. I mean, this was all authorized and directed by the Board of District Judges back in 2009, the 9th, 221st, 359th. This is a public record that we offered.

MR. BRASS: They never offered it.

MR. JAMES: He offered it at the beginning of the hearing. If not, I'm offering it as well.

THE COURT: Well, I'm going take all of these, make them part of the record. It's only for appellate purposes. To be honest with you, I skimmed them. But I didn't consider them, and I'm not going to consider them in my decision. I'm strictly going from

where we are on this other stuff.  I'm also going to attach Mr. Beauregard and Dr. Eschbach CVs so the appellate court has everything they need to make their decision.  All right.  And then hopefully by -- well, no, by Friday I'll have a decision.  I just want to review some cases and want to go back over that mandamus because I really should have done that before today.  All right.  Anything else?

MR. BRASS:  Not from us, Judge.

THE COURT:  Let's get a reset date before you leave, Mr. Brass.

(Proceedings concluded)

THE STATE OF TEXAS    )

COUNTY OF MONTGOMERY  )

I, Rebecca Lewis, Official Court Reporter in and for the 9th District Court of Montgomery County, State of Texas, do hereby certify that the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's record is $500.00 and will be paid by Montgomery County DA's Office.

WITNESS MY OFFICIAL HAND this the 21st day of August, 2014.

/s/Rebecca Lewis
REBECCA LEWIS, TEXAS CSR 8926
Expiration Date:  12/31/14
Official Court Reporter
Montgomery County, Texas
207 West Phillips, Suite 306
Conroe, Texas  77301

Appendix B - Order dated 4 August 2014 signed by Judge

RECEIVED AND FILED
FOR RECORD
At __12__ O'Clock __P__ M.

AUG 04 2014

BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS
By_____Deputy

### NO. 13-01-00685-CR & 1305-05517-CR

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 9th JUDICIAL DISTRICT |
| | § | |
| LEON DAVIS | § | MONTGOMERY COUNTY, TEXAS |

### ORDER

ON this __4__ day of August, 2014, came the Defendant for hearing on his MOTION TO PRODUCE JUROR ADDRESS DATA.

After hearing the evidence and argument of counsel, the Court hereby finds the following:

1. The Defendant has made a prima facia showing that there is a demonstrable and noticeable absence of citizens of African American Decent in the jury panels of Montgomery County.

2. There exists a need to test whether there is a systematic exclusion of Black citizens from jury service.

3. That the District Clerk possesses the electronic data of the addresses it sent, or had sent, juror summons to during the calendar year 2013.

4. The District Clerk has the ability to provide the Defendant's experts with such data that would enable them to compare said data to the United States Census data to determine if the juror summoning process in Montgomery County is racially neutral.

5. The prohibitions of ART. 35.29 of the TCCP do not apply as the address data requested is not collected "during the jury selection process" but rather the jury summoning process.

6. The prohibitions of Section 62.0132 do not apply as no information from jury summons questionnaires are being requested.

IT IS ACCORDING ORDERED that the District Clerk of Montgomery County produce to the experts appointed by this Court in this cause, to-wit: Dr. Karl Eschbach, and Mr. Max Beauregard, the address data of all jurors summoned for jury duty during the calendar year 2013 in electronic form. Dr. Eschbach and Mr. Beauregard will execute Confidentiality Agreements that the data turned over to them will be treated as confidential and shall only be used for the purposes stated in this order and not disseminated or shared with any other person or entity.

SIGNED THIS __4__ day of August, 2014.

_____
JUDGE PRESIDING

I, Barbara Gladden Adamick, do hereby
Certify __1__ pages in Cause # 13-01-DD685CR
as being a true and correct copy of the
Original Record now on file in the District
Clerk's Office of Montgomery County, Texas.

Witness My Official Seal of Office in Conroe, Texas
On This The __8__ Day of __August__, 2014.

By: _____ Deputy

Appendix C - Jury Selection Plan

#3
8 I²
12-19-05

# THE MONTGOMERY COUNTY ELECTRONIC JURY SELECTION PLAN

## (Amended, December 2005)

### AN AUTOMATED SYSTEM
### FOR
### MONTGOMERY COUNTY, TEXAS

### AS AUTHORIZED AND DIRECTED BY
### THE BOARD OF DISTRICT JUDGES, TO WIT:

| | |
|---|---|
| The Honorable Fred Edwards, | 9th District Court |
| The Honorable Suzanne Stovall, | 221st District Court |
| The Honorable Olen Underwood, | Sitting as 284th District Court |
| The Honorable Kathleen Hamilton, | 359th District Court |
| The Honorable K. Michael Mayes, | 410th District Court |

### Barbara Gladden Adamick
### District Clerk

#3
8 I²

# ELECTRONIC JURY SELECTION PLAN FOR
# MONTGOMERY COUNTY, TEXAS
## Section 62.011, Government Code

**SECTION 62.011**     Electronic or Mechanical Method of Selection

(a) On the recommendation of a majority of the district and criminal district judges of a county, the Commissioners Court, by order entered in its minutes, may adopt a plan for the selection of names of persons for jury service with the aid of mechanical or electronic equipment instead of drawing the names from a jury wheel.

(b) A plan authorized by this section for the selection of names of prospective jurors must:

(1) be proposed in writing to the Commissioners Court by a majority of the district and criminal district judges of the county at a meeting of the judges called for that purpose;

(2) specify that the source of names of persons for jury service is the same as that provided by Section 62.001 and that the names of persons listed in a register of persons exempt from jury service may not be used in preparing the record of names from which a jury list is selected, as provided by Sections 62.108 and 62.109;

(3) provide a fair, impartial, and objective method of selecting names of persons for jury service with the aid of electronic or mechanical equipment;

(4) designate the district clerk as the officer in charge of the selection process and define his duties; and

(5) provide that the method of selection will either use the same record of names for the selection of persons for jury service until that record is exhausted or will use the same record of names for a period of time specified by the plan.

(c) The provisions of this subchapter relating to the selection of names of persons for jury service by the use of a jury wheel do not apply in a county that adopts a plan authorized by this section for the selection of names of prospective jurors by the use of electronic or mechanical equipment.

(d) A state agency or the secretary of state may not charge a fee for furnishing a list of names required by Section 62.001.

(a) A plan authorized under Section 62.011 for the selection of names of prospective jurors may allow for a prospective juror to appear in response to a summons by:

(1) contacting the county officer responsible for summoning jurors by computer;

(2) calling an automated telephone system; or

(3) appearing before the court in person.

(b) A plan adopted under Subsection (a) may allow for a prospective juror to provide information to the county officer responsible for summoning jurors or for the county officer to provide information to the prospective juror by computer or automated telephone system including:

(1) information that permits the court to determine whether the prospective juror is qualified for jury service under Section 62.102;

(2) information that permits the court to determine whether the prospective juror is exempt from jury service under Section 62.106;

(3) submission of a request by the prospective juror for a postponement of or excuse from jury service under Section 62.110;

(4) information for jury assignment under Section 62.016, including:

(A) the prospective juror's postponement status;

(B) if the prospective juror could potentially serve on a jury in a justice court, the residency of the prospective juror; and

(C) if the prospective juror could potentially serve on a jury in a criminal matter, whether the prospective juror has been convicted of misdemeanor theft;

(5) completion and submission by the prospective juror of the written jury summons questionnaire under Section 62.0132;

(6) the prospective juror's electronic mail address; and

(7) notification to the prospective juror by electronic mail of:

(A) whether the prospective juror is qualified for jury service;

(B) the status of the exemption, postponement, or judicial excuse request of the prospective juror; or

(C) whether the prospective juror has been assigned to a jury

panel.

(c) The county officer responsible for summoning jurors shall purge the electronic mail address of a prospective juror collected under Subsection (b):

(1) if the prospective juror serves on a jury, not later than the 30th day after the date that:

(A) the county sends the person payment for jury service; or

(B) the county would otherwise send the person payment for jury service, if the person has donated the payment under Section 61.003; or

(2) if the prospective juror does not serve on a jury, not later than the 30th day after the date that the court releases the person from jury service.

WHEREAS, it is hereby recommended to Commissioners Court of Montgomery County, Texas, by a majority of the Judges of District Courts of Montgomery County, Texas, that the *Plan for Selecting Persons for Jury Service*, first recorded and adopted in the minutes of Montgomery County Commissioners Court in 1982, Volume 34, Page 335, secondly amended & adopted by Commissioner's Court on August 20, 2001, be amended and the new *Montgomery County Electronic Jury Selection Plan* under Section 62.011 Government Code of The State of Texas be adopted as follows:

A.   Source of names. (Gov't Code Sec. 62.001(a))

     The sources from which all names shall be taken is the current voter registration lists from all precincts in Montgomery County and all names on a current list to be furnished by the Department of Public Safety showing the citizens of Montgomery County who hold a valid Texas Drivers License and the citizens of the County, other than persons who are disqualified from Jury service, who hold a valid personal identification card or certificate held by the Department of Public Safety, except those exempt from jury service as provided by Sections 62.108 and 62.109 of the Government Code; and further provided that at any stage of this plan the voter registrar of Montgomery County, the Department of Public Safety, the Secretary of State, or the Montgomery County District Clerk may remove from Jury Service duplications of any citizen's name, or the name of any citizen who is disqualified from jury service, such as felons or aliens.

B.   Official in charge. (Gov't Code Sec. 62.011(b))

     The District Clerk of Montgomery County, Texas is designated as the official in charge of the Montgomery County Jury Selection process and is assigned the duties hereinafter enumerated and shall:

     1. Deputize as a clerk, a Jury Coordinator with computer skills.

     2. Cause the tasks directed in this plan to be automated.

     3. Direct and coordinate with Communication Information Services/and or such designated vendor, the program or programs necessary for the automation of the tasks in this plan.

C.   Electronic file of prospective jurors for a two years. (Gov't Code Sec. 62.001(g))

     1. On or before August 1 of odd numbered years, the District clerk shall request the Secretary of State to prepare the Jury File for Montgomery County from the sources provided herein.

2. On or before August 1 of odd numbered years the Registrar of Voters of Montgomery County, Texas will certify and transfer to the Secretary of State of Texas the Jury wheel File in a format requested by the Secretary of State as follows:

An electronic file containing a complete voter registration listing, as of a day certain, of all persons who are Registered Voters of Montgomery County, excluding the names of persons on the exemption list provided for in Section 62.108 and 62.109 of the Government Code and those otherwise prohibited by law from serving as jurors;

An electronic file of the permanent exemptions under Article 62.108 and 62.109 of the Government Code and of the felony convictions that have been excluded; and

An electronic file of felony convictions in Montgomery County.

(Transfer of Jury Wheel File)

3. On or before October 1 of odd numbered years, the Department of Public Safety shall transfer to the Secretary of State, in a format requested by the Secretary of State, the names of those drivers from Montgomery County, provided for in Article 62.001 of the Government Code and who have registered for driver's license, and the citizens of Montgomery County who hold a valid personal identification card or certificate held by the Department of Public Safety (other than persons who are disqualified from Jury Service). The Department of Public Safety may exclude from this file those persons identified as aliens or as felons.

(Removal of Exempt and Felony Persons)

4. On or before October 15 of odd numbered years, the Secretary of State will remove from the list of those persons in the electronic file delivered to that office by the Department of Public Safety, insofar as they can be identified and matched by the information in the Jury Wheel File, the names of those persons on the permanent exemptions from jury duty file and those persons in the felony file provided to the Secretary of State by the Voter Registrar of Montgomery county.

(Merging of Files)

5. The Secretary of State shall then merge the names of the Montgomery County Voter Registration file transferred by the Montgomery County Drivers Registrations and persons with identification numbers transferred by the Department of Public Safety and shall remove all duplications of the merged file only once. This merged file called the *Prospective Montgomery County Jury Wheel File,* shall be transferred to the District Clerk of Montgomery County by December 1 of odd numbered years, in the format requested by the Montgomery County District Clerk.

(Prospective Montgomery County Jury Wheel File)

6. The District Clerk of Montgomery County shall accept the *Prospective Montgomery County Jury Wheel File* from the Secretary of State when it is delivered. The District Clerk or District Clerk deputy and the Sheriff or his deputy in the presence of each other, shall cause the *Prospective Montgomery County Jury Wheel File*, to be transported to Communication Information Services office of Montgomery County. A designated staff person or representative in the CIS office will download the tape onto a computer known as IBM R.S.

6000 for creation and testing. Upon verification of a completed tape, the District Clerk, Sheriff, CIS Director or a representative from each office, will certify said tape as the new *"Prospective Montgomery County Jury Wheel File"*, thus, allowing for the new " *Prospective Montgomery County Jury Wheel File"* to be on-line for selection after January 1 of even numbered years. The District Clerk, Sheriff and or their representative shall deliver the original of the new *"Prospective Montgomery County Jury Wheel File"*, which is a CD, to the District Clerk's Office where it will be stored in a fire proof safe, thus protecting from further writing.

(Jury File)

7. After the above creation and testing of the new *"Prospective Montgomery County Jury wheel File"*, in accordance with this plan, the jury wheel file will be opened and the obsolete *"Prospective Montgomery County Jury Wheel File"* will be removed, to be destroyed one year from the date of removal, per record retention guidelines.

D. **Program for Selection (Gov. Code Sec. 62.011(a-b))**

The District Clerk, with the assistance of Communication Information Service of Montgomery County, shall prepare an electronic and automated system which will cause an electronic means of selecting persons called for jury service from the *Montgomery County Prospective Jury Wheel File*, by a fair, impartial, and objective method, to produce a list showing the names and addresses of persons so selected for designated dates, as hereinafter provided.

E. **Presiding Judge Appointee (Gov't Code Sec. 62.011; 62.5101-B)**

The District Clerk, appointed by the Presiding Board of Judges on August 5, 2005, or a District/County Court at Law Judge shall preside over the Central Jury Panel, being available to qualify the panel for service in the various Courts on a weekly basis.

F. **Selection of Jurors (Gov't Code 62.011)**

Each week or month, or three (3) weeks prior to requested appearance, the Court Coordinator, under the direction of the Judge of each County and District Court shall submit to the District Clerk Jury Coordinator a Court's "Request for Jurors." (Being form # 2 of the Jury Pool Guidelines). The request shall specify the following:

1. dates of appearances;
2. number of jurors to appear for each date;
3. appearance time for each date; and
4. the Courtroom or place designated as a Courtroom or assembly area for jurors to appear on each date.

On Thursday of each week, the Jury Coordinator or representative will calculate from the timely filed requests, the specified number of jurors to appear three weeks away. The Jury Coordinator shall electronically transmit these requests to the designated person/vendor. The designated person shall cause their computer to print out the specified number of prospective

Page 7 of 9

jurors with their name, address, juror number and TDL or voter registration number on front of the summons. These summons shall be placed in the mail within two (2) days from the date of request by jury coordinator, per designation of the Sheriff. The person/vendor shall transmit the original summarized jury list containing the names and addresses of all prospective jurors summoned for each date of appearance to the Jury Coordinator. The Jury Coordinator/representative shall deliver such list to the County Clerk's Office for filing. A duplicate copy shall be retained by the Jury Coordinator, to be viewed at the Judge's discretion.

G.     Interchangeable Juries:

The Jurors so selected, qualified, instructed and sworn shall constitute a general panel for the week for service as jurors in all district, county, juvenile and justice courts in Montgomery County, and shall be used interchangeable in all of said courts. The Presiding Judge or representative shall assign such jurors out in panels to the different courts as requested by the judges of said courts.

H.     Amendments:

This plan may be amended by the Commissioners Court upon recommendation of a majority of the District Judges of Montgomery County.

--------------------------

The foregoing  9  pages approving the Montgomery County Electronic Jury Selection Plan, amended December 2005, was adopted by a majority of the District Judges of Montgomery County, Texas, at a meeting called for that purpose this _13__ day of __December__, 2005.

Honorable Fred Edwards
Judge of 9th Judicial District

Honorable Suzanne Stovall
Judge of 221st Judicial District

Honorable Olen Underwood
Sitting as Judge of 284th Judicial District

Honorable Kathleen Hamilton
Judge of 359th Judicial District

Honorable K. Michael Mayes
Judge of 416th Judicial District

# RESOLUTION AND ORDER OF THE

# COMMISSIONERS COURT OF MONTGOMERY COUNTY, TEXAS

On this _19_ day of _December_ , 2005, at a duly posted and called meeting of the Commissioners Court, a motion made by _Doyal_ , and seconded by _Rinehart_ , did consider and pass the foregoing Montgomery County Electronic Jury Selection Plan.

BE IT RESOLVED that this resolution and order shall remain in effect until further orders of the Court.

ADOPTED AND PASSED, this the _19th_ day of _December_ , 2005.

Mike Meador
Commissioner, Precinct # 1

Craig Doyal
Commissioner, Precinct # 2

Ed Chance
Commissioner, Precinct # 3

Ed Rinehart
Commissioner, Precinct # 4

Alan B. Sadler
County Judge

# Appendix D – Memorandum

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-14-00337-CR

_____

### IN RE BRETT W. LIGON, MONTGOMERY COUNTY DISTRICT ATTORNEY, AND BARBARA ADAMICK, MONTGOMERY COUNTY DISTRICT CLERK

**Original Proceeding**

### MEMORANDUM OPINION

In a petition for writ of mandamus, Brett W. Ligon, the Montgomery County District Attorney, and Barbara Adamick, the Montgomery County District Clerk, ask this Court to order the judge of the 9th District Court of Montgomery County, Texas, to vacate his order requiring them to disclose to the defense in a criminal case the address of every person who has been summoned for jury service in Montgomery County during calendar year 2013. We requested a response from the real party in interest, Leon Davis. Upon review of the mandamus petition, the mandamus record, and Davis's response, we conclude the trial court abused its

1

discretion by ordering production of the information at issue. We conditionally grant relators' request for relief.

The indictments filed in case numbers 13-01-00685-CR and 13-05-05517-CR accuse Davis of evading arrest or detention with a motor vehicle and retail theft, and allege that Davis is a habitual criminal. Davis filed a motion challenging the juror summoning process based on racial bias. No hearing has been scheduled for that motion. Davis also filed a motion to produce juror address data. That motion stated that a motion for deposition of witnesses was scheduled for March 27, 2014, but Davis subsequently withdrew the motion and at the beginning of the hearing on the motion to produce juror address data, Davis's counsel stated, "I'm formally withdrawing and abandoning my request to take anyone's deposition." Davis also abandoned his motion to change venue.

At the hearing on Davis's motion to produce juror address data, Davis's counsel stated that the defense believes that a disproportionate number of citizens of African-American descent serve on jury panels for an unknown reason. Davis hypothesizes that the reason is because there is an unidentified defect in the way jurors are summoned. Davis seeks data on the jurors' addresses so that he can compare them with census population data which, he argues, will enable his experts to discern whether the jury summoning process is racially neutral. He is not

challenging the array. On August 4, 2014, the trial court ordered Adamick to produce "the address data of all jurors summoned for jury duty during the calendar year 2013 in electronic form[,]" to two experts retained by the defendant.

This is the second time relators have sought similar mandamus relief in the same criminal case. *See In re Ligon*, No. 09-13-00389-CR, 2013 WL 5658610, at *1 (Tex. App.—Beaumont Oct. 16, 2013, orig. proceeding) (not designated for publication). In the previous proceeding, we held the trial court abused its discretion by ordering relators to disclose information from questionnaires filled out by prospective jurors in cases other than Davis's. *Id.* at *4. We held the questionnaires were confidential. *Id.* at *2; *see also* Tex. Code Crim. Proc. Ann. art. 35.29 (West Supp. 2014); Tex. Gov't Code Ann. § 62.0132 (West 2013). In his response to relators' petition in this new proceeding, Davis argues that the trial court's new order is distinguishable from the order that was at issue in the first mandamus proceeding because this order requires limited disclosure and production of the electronic data from which the juror questionnaires are generated, not the completed questionnaires themselves. *See* Tex. Gov't Code Ann. § 62.0132(g) (describing persons to whom "[t]he information contained in a completed questionnaire may be disclosed[.]"). Davis argues the summoned jurors' addresses are not information collected in the jury selection process. *See* Tex. Code

Crim. Proc. Ann. art. 35.29. Davis argues that Montgomery County's electronic jury selection plan authorizes the trial judge to view the address list that the judge ordered Adamick to produce in electronic form and allows the judge to order that the address list be turned over to the defense's experts. Also, Davis argues that section 62.011(b)(4) of the Texas Government Code and Montgomery County's jury selection plan empower the trial judge to exercise supervisory authority over the District Clerk by ordering her to provide the electronic information to Davis. *See* Tex. Gov't Code Ann. § 62.011(b)(4) (West 2013).

None of these reasons provides a reasonable basis for distinguishing the first mandamus proceeding that arose during the State's prosecution of Davis from the current mandamus proceeding. *See Ligon*, 2013 WL 5658610, at **1-4. This time the trial court ordered Adamick to produce and disclose to Davis the address of every person summoned to jury service for the Montgomery County district courts and county courts at law in 2013. Summoning jurors is part of the jury selection process. *See* Tex. Gov't Code Ann. § 62.001 (West 2013); Tex. Code Crim. Proc. Ann. arts. 33.09 (West 2006), 35.01 (West Supp. 2014). The summoned person's address is required information for the confidential questionnaire. *See* Tex. Gov't Code Ann. § 62.0132(c)(2).

4

Davis argues that each summoned juror's address is not confidential in this context, because the questionnaire itself is not being disclosed. Montgomery County's jury selection plan states that the information retained by the District Clerk's Jury Coordinator is a computer printout of "the specified number of prospective jurors with their name, address, juror number and TDL or voter registration number on front of the summons." This is the confidential information mentioned in section 62.0132 of the Texas Government Code and article 35.29 of the Texas Code of Criminal Procedure. *See* Tex. Gov't Code Ann. § 62.0132; Tex. Code Crim. Proc. Ann. art. 35.29.[1] The jurors' personal information is not transformed from confidential to public information even though under Montgomery County's jury selection plan the District Clerk prints a "summarized jury list containing the names and addresses of all prospective jurors summoned for each date of appearance" and a judge who requested a jury is allowed to see the printout.

Davis argues that the trial judge's order to disclose electronic information about the summoned jurors is within the court's discretion because Montgomery County's jury selection plan requires that the jury coordinator retain a list of the

---

[1]Davis did not argue, in this Court or in the trial court, that he presented good cause for the trial court to order disclosure of personal information about jurors. *See* Tex. Code Crim. Proc. Ann. art. 35.29(b) (West Supp. 2014).

5

names and addresses of the prospective jurors "to be viewed at the Judge's discretion[,]" but the trial judge has not asked for access to the summarized jury list. Rather, the judge ordered Adamick to produce to the defendant in a criminal case the address data of all persons who were summoned for jury service in Montgomery County in 2013. By requiring Adamick to make a disclosure that is neither required nor provided for by Montgomery County's jury selection plan, the trial judge is not enforcing a non-discretionary duty owed by Adamick in the performance of her official functions under the plan.

Davis argues the trial court has the authority to issue an order to secure petit juror information under the compulsory process clause of the Sixth Amendment. *See* U.S. Const. Amend. VI. The jurors whose information is to be disclosed to Davis have no connection to his case whatsoever. They are people who were summoned to appear for jury service in other cases unrelated to the State's prosecution of Davis.

Without citing any precedent and relying solely on the Sixth Amendment, Davis argues that the trial court has the power to order Adamick to produce juror address data because at the hearing Davis presented evidence "questioning the inclusion of African-Americans in the jury selection process." Several defense attorneys testified that in their experience few African-Americans appear on

venires in Montgomery County. The jury system supervisor for the District Clerk's office testified that jury summonses are generated from an electronic file of names and addresses. He could not isolate and produce an electronic data file of the jurors who were summoned in 2013, although it is possible that the county IT department could.

Karl Eschbach, a demographer who has been retained by Davis, testified that having the juror's addresses would enable him to geo-code the data with geographic counts of racial populations and perform a statistical analysis of whether the jury summonses were consistent with the representation of African-Americans in the county. Dr. Eschbach had no information regarding driver's licenses or voter registrations, and would simply determine whether there was a statistically equivalent representation or gross under-representation of "African-American residential areas" in the areas where summonses were sent. The work he would perform with the data would help identify "whether there was an issue that needed to be addressed."

A defendant has a right to compulsory process only for obtaining evidence that is both material and favorable to the defense. *Coleman v. State*, 966 S.W.2d 525, 527-28 (Tex. Crim. App. 1998) The requested data would make it possible to discover if areas that have high concentrations of African-Americans are

statistically underrepresented in jury summonses, but Davis presented no evidence that jury summonses are produced in any manner other than by randomized selection from driver's licenses and voter registrations obtained from the Secretary of State, and in his response to the mandamus petition, Davis concedes the selection results from a computer program approved under the statute that allows an electronic method of jury selection. *See* Tex. Gov't Code Ann. § 62.011. The evidentiary value of the information that the trial court ordered Adamick to produce and disclose to the defense is entirely speculative. Absent a showing that the jurors' personal information would be both material and favorable to him, the compulsory process clause does not require that the information be produced. *See Coleman*, 966 S.W.2d at 528.

In a criminal case, a relator may establish an entitlement to mandamus relief by showing a clear right to relief and the lack of an adequate remedy at law. *See In re State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana*, 236 S.W.3d 207, 210 (Tex. Crim. App. 2007). "A clear right to relief is shown when the facts and circumstances dictate but one rational decision 'under unequivocal, well-settled (i.e., from extant statutory, constitutional, or case law sources) and clearly controlling legal principles.'" *In re State ex rel. Weeks*, 391 S.W.3d 117, 122 (Tex. Crim. App. 2013) (quoting *Bowen v. Carnes*, 343 S.W.3d 805, 810 (Tex.

8

Crim. App. 2011)). A trial court has a "ministerial duty" to vacate an order which it lacked the authority to issue. *See State ex rel. Thomas v. Banner*, 724 S.W.2d 81, 83 (Tex. Crim. App. 1987). Mandamus relief is appropriate when the trial court issues a discovery order that is beyond the scope of its authority. *See In re State ex. rel. Robinson*, 116 S.W.3d 115, 117-18 (Tex. App.—Houston [14th Dist.] 2002, orig. proceeding); *In re State ex. rel. Wade v. Stephens*, 724 S.W.2d 141, 143-44 (Tex. App.—Dallas 1987, orig. proceeding).

The State cannot pursue a pre-trial appeal of the trial court's order. *See* Tex. Code Crim. Proc. Ann. art. 44.01 (West Supp. 2014). Davis argues that Adamick may present a complaint regarding the trial judge's order with the county's Board of District Judges and the Commissioner's Court, and contends that a complaint to those bodies provides an adequate remedy at law. The trial court signed an order in a criminal case, and by virtue of that command, Adamick must obey or face possible contempt proceedings. *See Ex parte Hughes*, 759 S.W.2d 118, 120 (Tex. 1988). If the trial judge exceeded his authority in making that order in a criminal case, it is this Court, not the Board of Judges or the Commissioner's Court, with the jurisdiction to order the judge to vacate that order. *See* Tex. Gov't Code Ann. § 22.221(b) (West 2004). Relators have established that they lack an adequate remedy at law.

9

The trial court abused its discretion when it required the Montgomery County District Clerk to produce and disclose confidential personal information without an adequate showing that the information is material and favorable to the defense. We conditionally grant relators' petition for writ of mandamus and direct the trial court to vacate its order requiring disclosure of the address of every person who has been summoned for jury service in Montgomery County during calendar year 2013. Because we are confident the trial court will vacate its order, the writ shall issue only if the trial court fails to act within a reasonable time.

PETITION CONDITIONALLY GRANTED.

PER CURIAM

Submitted on September 4, 2014
Opinion Delivered October 8, 2014
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

10

# Appendix E - Motion for Protective Order

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **9TH JUDICIAL DISTRICT** |
| | § | |
| **v.** | § | |
| | § | |
| **LEON DAVIS** | § | **MONTGOMERY COUNTY, TEXAS** |



## MONTGOMERY COUNTY DISTRICT CLERK BARBARA ADAMICK'S MOTION FOR PROTECTIVE ORDER

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

The Montgomery County District Clerk Barbara Adamick ("District Clerk") files this Motion for Protective Order in response to Defendant Leon Davis' ("Defendant") Motion to Produce Juror Address Data in which defendant seeks the summoned juror address data from the District Clerk, and would request that the Court deny the Defendant's motion and grant the District Clerk's motion for protective order.

### I. Issue is Premature

The Defendant's request for summoned juror address data should not be granted because the issue which Defendant seeks discovery on is not ripe and is premature. Defendant speculates that the jury summoning system in Montgomery County is not racially neutral, and argues for the need for summoned juror address data to determine if that is true. The Court of Appeals has already granted the State mandamus relief from a previous order to disclose juror information (name, sex, race, age, address, marital status, education, employment) to the Defendant, and noted that the Defendant's objection to the racial composition is merely speculative at this point because the array from which Defendant's jury will be drawn has not yet been selected. *In re Brett W. Ligon*, No. 09-13-00389-CR, 2013 WL 5658610 (Tex.App.-Beaumont Oct. 16, 2013 (orig.proceeding)(mem.op., not designated for publication). The Court of Appeals further noted

that defendant admitted he was on a fishing expedition when he first asked for the juror information, and that the Defendant was seeking to address a hypothetical problem that the Defendant himself is not even sure really exists. *In re Ligon* at 4.

## II.    Defendant Requesting Same Confidential Juror Information

The Court of Appeals has already denied this Defendant access to juror address information because the juror information sought by defendant is confidential and protected under privacy rights by the State Legislature. *In re Ligon* at 4 citing Tex. Gov't Code Sec. 62.0132(g) and Tex. Code Crim. Proc. Ann. Art. 35.29. Defendant's motion is asking for the exact same information that the Court of Appeals has described is confidential juror information (name, sex, race, age, address, marital status, education, employment).

## III.    Protective Order is Necessary to Protect Confidential Juror Information

Defendant's discovery request for juror address information invades personal or constitutional rights to privacy and should be denied in whole, and the County Clerk should be protected by the Court from having to produce such information now and in the future in this matter.

Respectfully submitted,

JD LAMBRIGHT
MONTGOMERY COUNTY ATTORNEY
207 West Phillips Street, Suite 100
Conroe, Texas 77301
Tel: (936) 539-7828  Fax: (936) 760-6920

By: _____
Stuart Hughes
State Bar No. 24041151
E-Mail: stuart.hughes@mctx.org
Attorney for MONTGOMERY COUNTY
DISTRICT CLERK

## Certificate of Service

I certify that a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on April 17, 2014.

_____
Stuart Hughes
Attorney for MONTGOMERY COUNTY
DISTRICT CLERK